UPPER TRINITY REGIONAL WATER DISTRICT and Texas Commission on Environmental Quality, Appellants

v.

NATIONAL WILDLIFE FEDERATION, Appellee

NO. 01–15–00374–CV

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued January 26, 2017

Rehearing Overruled March 30, 2017

Lambeth Townsend, Jason T. Hill, Elizabeth P. Hernandez, Lloyd Gosselink Rochelle & Townsend, P.C., Austin, TX, Attorneys for The Upper Trinity Regional Water District.

Ken Paxton, Attorney General of Texas, Cynthia Woelk, Assistant Attorney General, Austin, TX, Attorneys for Texas Commission on Environmental Quality.

Myron J. Hess, Annie E. Kellough, Austin, TX, Attorneys for National Wildlife Federation.

Panel consists of Justices Jennings, Massengale, and Huddle.

## OPINION

Rebeca Huddle, Justice

Upper Trinity Regional Water District and the Texas Commission on Environmental Quality (TCEQ) appeal the district court's judgment reversing and remanding a portion of the TCEQ's order granting Upper Trinity a permit for an interbasin water transfer. Appellee National Wildlife Federation (NWF) participated in a contested case hearing protesting the permit, and, following TCEQ's grant of the permit, appealed to the district court. The district court found that TCEQ erred in finding that Upper Trinity had developed and implemented a water conservation plan that would result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction, as required by section 11.085($l$)(2) of the Water Code. Because substantial evidence supports TCEQ's decision, we reverse the district court's judgment and affirm the TCEQ's order.

## Background

Upper Trinity is a wholesale water provider that serves approximately 30 cities and utilities in the northern part of Texas. Upper Trinity's customers buy water from it and resell the water to retail customers, which include businesses and homeowners.

### Upper Trinity applies for an interbasin water transfer permit

In 2003, Upper Trinity applied to the TCEQ for a permit for the Lake Ralph Hall project. The project involved building a reservoir and transferring water from

the Sulphur River Basin to the Trinity River Basin. TCEQ conducted a technical review and in 2011, issued a draft permit. TCEQ subsequently considered requests for a contested case hearing from opponents of the application, granted 10 requests, and referred the application to the State Office of Administrative Hearing (SOAH).

### The contested case hearing and TCEQ's order

In January 2013, the contested case hearing was held before two SOAH administrative law judges (ALJs). TCEQ, Upper Trinity, NWF, and several other entities protesting the permit participated and presented evidence. The ALJs heard live testimony, received exhibits, and considered pre-filed testimony. The ALJs issued a Proposal for Decision recommending that TCEQ grant the application and issue the permit because Upper Trinity had met all statutory and regulatory requirements.

NWF filed exceptions to the Proposal, and Upper Trinity and TCEQ filed responses. TCEQ reviewed the Proposal, exceptions, and responses, and it granted the permit in an order setting forth 516 findings of fact and 33 conclusions of law. NWF filed a motion for rehearing on the grounds that Upper Trinity did not meet its burden to develop and implement a water conservation plan that complied with section 11.085($l$)(2). The motion for rehearing was overruled by operation of law.

### NWF appeals TCEQ's order

NWF sued TCEQ in district court challenging the following three findings in TCEQ's order relating to Upper Trinity's water conservation plan:

- that the plan met the requirements of Water Code section 11.1085($l$)(2);
- that the plan met the requirements of Administrative Code section 288.5(1)(H); and
- that the plan's goals were reasonable and proposed measures were adequate.

Upper Trinity intervened as a party-defendant. The parties filed briefs and admitted the administrative record for the district court's review. The district court found that TCEQ erred in concluding that Upper Trinity's conservation plan met the requirements of section 11.085($l$)(2) and entered judgment reversing only that portion of TCEQ's 49–page order. The district court found that NWF's other claims were moot in light of the remand. TCEQ and Upper Trinity appealed.[1]

### Discussion

TCEQ and Upper Trinity contend that the district court's order should be reversed and TCEQ's order affirmed because substantial evidence supports TCEQ's finding that Upper Trinity complied with Water Code section 11.085($l$)(2) by developing and implementing a water conservation plan that would result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction. NWF responds that the district court's order should be affirmed because TCEQ misinterpreted the statutory requirement, relied upon improper sources to make its determination, and its decision is contravened by conflicting evidence.

### A. Standard of Review

█ On appeal, we consider whether substantial evidence supports TCEQ's de-

---

1. On April 21, 2015, the Texas Supreme Court ordered this appeal transferred from the Court of Appeals for the Third District of Texas. *See* Tex. Gov't Code § 73.001 (authorizing transfer of cases). We will apply the prec- edent of the Court of Appeals for the Third District because of the unique issues raised by an administrative appeal. *See* Tex. R. App. P. 41.3.

cision to approve Upper Trinity's water conservation plan. TEX. GOV'T CODE § 2001.174. The substantial evidence standard requires that we reverse or remand a case for further proceedings only "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of TCEQ's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* "An agency's decision is arbitrary or ... an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994).

██ In applying the substantial evidence standard of review, we may not substitute our judgment for that of TCEQ on the weight of the evidence on questions committed to its discretion. TEX. GOV'T CODE § 2001.174; *Mireles v. Tex. Dep't of Pub. Safety,* 9 S.W.3d 128, 131 (Tex. 1999). To the extent the dispute concerns whether the decision to grant the permit was supported by reliable and probative evidence, the issue for us is not whether TCEQ's decision was correct, but only whether the record demonstrates some reasonable basis for TCEQ's decision. TEX. GOV'T CODE § 2001.174(2)(E); *Mireles,* 9 S.W.3d at 131; *see Tex. Health Facilities Comm'n v. Charter Med.–Dall., Inc.,* 665 S.W.2d 446, 452 (Tex. 1984) ("The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency."). TCEQ "determines the meaning, weight, and credibility to assign conflicting evidence." *See Cty. of Reeves v. Tex. Comm'n on Envtl. Quality,* 266 S.W.3d 516, 528 (Tex. App.–Austin 2008, no pet.). Thus, we will sustain TCEQ's decision if the evidence is such that reasonable minds could have reached the conclusion TCEQ must have reached in order to justify its action. *Tex. Health Facilities Comm'n,* 665 S.W.2d at 453. We "must affirm" TCEQ's order "if there is more than a scintilla of evidence" to support it. *Mireles,* 9 S.W.3d at 131. "[E]ven if the evidence actually preponderates against" TCEQ's decision, we must uphold it "so long as enough evidence suggests [its] determination was within the bounds of reasonableness." *Slay v. Tex. Comm'n on Envtl. Quality,* 351 S.W.3d 532, 549 (Tex. App.–Austin 2011, pet. denied).

██ The district court's judgment reversing in part TCEQ's order is not entitled to deference on appeal. *Cty. of Reeves,* 266 S.W.3d at 528 (citing *Tex. Dep't of Pub. Safety v. Alford,* 209 S.W.3d 101, 103 (Tex. 2006) (per curiam)). We presume that TCEQ's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on NWF to demonstrate otherwise. *See State v. Pub. Util. Comm'n of Tex.,* 883 S.W.2d 190, 204 (Tex. 1994); *Froemming v. Tex. State Bd. of Dental Exam'rs,* 380 S.W.3d 787, 791 (Tex. App.–Austin 2012, no pet.); *Cty. of Reeves,* 266 S.W.3d at 528.

## B. Water Code Section 11.085(*l* )(2)

We review de novo the legal question of whether TCEQ properly construed a statute. *See R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Our primary concern is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). We apply the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context or the plain meaning leads to absurd results. *See Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010). "We generally avoid construing individual provisions of a statute in isolation from the statute as a whole[,]" *Tex. Citizens*, 336 S.W.3d at 628, because we must consider a provision's role in the broader statutory scheme, *see 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008), and we presume that the entire statute is intended to be effective, *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001). In reviewing the statute, we may take the agency's construction of the statute into consideration, but we defer to the agency's construction only when the statutory language is ambiguous. *Tex. Citizens*, 336 S.W.3d at 625.

When a statute contains a term that is undefined, the term is typically given its ordinary meaning. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016) (citing *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013)). "But the meaning must be in harmony and consistent with other statutory terms and '[i]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning.'" *Id.* (quoting *$1,760.00 in U.S. Currency*, 406 S.W.3d at 180). "If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme." *Id.* (citing *Thompson v. Tex. Dep't of Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014)).

Section 11.085(*l* )(2) of the Water Code provides in relevant part:

> The commission may grant, in whole or in part, an application for an interbasin transfer only to the extent that:
>
> (2) the applicant for the interbasin transfer . . . has developed and implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant.

Tex. Water Code § 11.085(*l* )(2). The parties dispute the degree of discretion section 11.085(*l* )(2) affords to TCEQ in determining whether a water conservation plan meets this standard. NWF contends that the statute's use of the terms "practicable" and "achievable" effectively requires an applicant, in response to a contest to its application, to adduce evidence regarding why it omitted any conservation measure that a permit-challenger contends should have been included in its conservation plan. *See* Tex. Water Code § 11.085(e) (contested application for interbasin transfer permit subject to evidentiary hearing); 30 Tex. Admin. Code § 80.17(a) (burden of proof at contested case hearing is on moving party by a preponderance of the evidence). More specifically, NWF argues that Upper Trinity failed to include in its conservation plan two available conservation measures—a coin-operated clothes washer rebate program and landscape irrigation restrictions. It argues that section 11.085(*l* )(2) effectively required Upper Trinity to explain the basis for their omission. In contrast, appellants argue that section 11.085(*l* )(2) does not require an applicant to explain its decision not to

adopt any particular conservation measure. Rather, appellants argue that each applicant's plan is unique and should be assessed on a case-by-case basis by considering whether the plan as a whole satisfies the statute given the applicant's individual circumstances.

 The Water Code does not define "practicable" or "achievable," so we give them their common, ordinary meanings. *See Sw. Royalties*, 500 S.W.3d at 405. "Practicable" means "capable of being put into practice or of being done or accomplished." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 974 (11th ed. 2003). "Achievable" is the adjective form of "achieve," which means "to carry out successfully." *Id.* at 10. Hence, Water Code section 11.085($l$)(2) permits TCEQ to approve applications only to the extent that the applicant's water conservation plan will result in the highest levels of water conservation and efficiency capable of being put into practice and carried out successfully within its jurisdiction. *See* TEX. WATER CODE § 11.085($l$)(2). Section 11.085($l$)(2) thus does not require that an applicant's plan be measured against fixed criteria; instead, under the statutory standard, TCEQ must determine which conservation measures an applicant is capable of putting into practice and carrying out successfully in its jurisdiction.

### 1. Satisfaction of section 11.085($l$)(2) requirements

The district court reversed TCEQ's finding that Upper Trinity's plan "satisfied the requirements imposed by Texas Water Code § 11.085($l$)(2)." NWF argues that this finding violates a statutory provision, is arbitrary and capricious and an abuse of discretion, and is not supported by substantial evidence, because there was no evidence that Upper Trinity developed a

conservation plan that met the requirements of section 11.085($l$)(2). We therefore consider the evidence that the parties presented at the contested case hearing, upon which TCEQ relied in making its determination.

Thomas Gooch, an expert in water planning and permitting, testified at the contested case hearing in support of Upper Trinity's plan. Gooch's pre-filed testimony was also admitted. Gooch testified that he has consulted on the development of regional water plans throughout Texas, including for Regions A, B, C, E, F, G, I, and J. Gooch was the principal author of the 2011 Region C Water Plan[2], which recommends management practices for wholesale water suppliers in Region C, in which Upper Trinity is located.

Gooch testified that "[t]he level of municipal water conservation and reuse reflected in the Region C Water Plan is the highest in the state, compared to municipal conservation and reuse in other regional water plans." Gooch testified that he has worked on "a wide array of water rights matters over the last 30 years" including projects involving water transfers. He testified that he is familiar with section 11.085($l$)(2) and that water transfers were an "integral portion" of Region C's water plan strategies.

Gooch testified that the determination of whether a plan satisfies section 11.085($l$)(2) must be a case-by-case determination, because the particular facts of each case dictate which measures should be used to attain the highest practicable levels of water conservation and efficiency achievable within the jurisdiction. Gooch testified that Upper Trinity's plan will result in the highest practicable levels of water conservation and efficiency achiev-

---

**2.** The Region C Water Plan recommended the Lake Ralph Hall project as one of the man-

agement strategies to meet Upper Trinity's projected water shortfall.

able within its jurisdiction. According to Gooch, the plan included many significant water conservation measures, including:

- A reservoir system to maximize efficient use of available water;
- A water conservation demonstration garden;
- Time-of-day restrictions on summer irrigation;
- Pressure control in treated water delivery systems which conserves energy and minimizes losses;
- A watershed protection program to protect water resources; and
- Annual reports to review the effectiveness of the conservation program.

Gooch further testified that the plan included a number of goals designed to increase water conservation, including maintaining the level of unaccounted water below five percent and maintaining a program of universal metering and meter calibration, replacement, and repair. Gooch noted that Upper Trinity has a limited ability to influence the actions of retail customers, because it does not have a direct relationship with those customers, and that many of NWF's criticisms of the measures included in or excluded from Upper Trinity's plan were inappropriate for that reason.

Gooch also compared the measures in Upper Trinity's conservation plan to the best management practices (BMPs) in the "Water Conservation Best Management Practices Guide," also referred to as "Report 362," which was prepared by the Water Conservation Implementation Task Force and published by the Texas Water Development Board. Gooch noted that the Region C Water Plan treats Report 362 as setting forth the standard for the "highest practicable levels of water conservation and efficiency achievable" by water suppliers. According to Gooch, Upper Trinity's

conservation plan included a number of BMPs recommended by Report 362 for wholesale water suppliers, including:

- Wholesale agency baseline profile, goals, and water system accounting an measurement;
- Requirement in wholesale contracts for development of water conservation plans;
- Conservation-oriented water rates, which encourages its customers to control peak water use in the summer in order to minimize charges for peak use and an incentive to control water use year round to minimize volume charges;
- Wholesale customer assistance in development of their own conservation plans, as well as an area-wide education and outreach plan;
- Reuse and recycling program, with plans to greatly expand its indirect reuse program.

Gooch testified that the combination of all of these goals and measures ensured that Upper Trinity's plan would result in the highest levels of water conservation and efficiency achievable by Upper Trinity.

Thomas Taylor, Upper Trinity's executive director, also testified. Like Gooch, Taylor testified that Upper Trinity's plan will result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction. According to Taylor, Upper Trinity's plan included measures that resulted in a 10 percent reduction in gallons per capita per day usage between 2005 and 2011, including:

- Prohibiting appointment of elected officials to the board to avoid politically motivated decisions and keep focus on merit and accountability with respect to conservation;
- A weighted voting system amongst members to encourage "prudent de-

cisions naturally inclined towards conservation;"

- Refusing to enter into take-or-pay contracts where wholesale customers must pay for water regardless of use; instead, Upper Trinity's contracts only obligate customers to pay for water actually used, and thus the rate policy naturally encourages conservation of water;
- Including drought adjustment clauses in contracts that raises rates during drought conditions, encouraging use of less water;
- Creation of a conservation trust which promotes conservation;
- Short time horizon contracts of three or five years to discourage oversubscription and encourage periodic assessment;
- Imposition of demand charges on a yearly basis, which encourages wholesale customers to not increase their water subscription because the increased demand charges will be imposed over the entire contract year, including retroactively.

Like Gooch, Taylor noted that because Upper Trinity "has no ordinance powers for enforcement on individual retail customers, [it] is somewhat limited to mutually acceptable strategies to help promote and achieve water conservation."

With respect to documentary evidence, TCEQ introduced a technical memorandum prepared by TCEQ Senior Water Conservation Specialist Kristin Wang. Wang's memo concludes that under Upper Trinity's conservation plan, "the highest practicable level of conservation for [Upper Trinity] can be achieved." The memo analyzes the various measures included in Upper Trinity's plan and discusses Upper Trinity's obligations and limitations as a wholesale water supplier. It also discusses the recommendations in Report 362 and

the Region C Water Plan and how they should be applied to Upper Trinity.

TCEQ thus was presented with testimonial and documentary evidence that Upper Trinity developed a plan that satisfied the requirements of section 11.085($l$)(2). *See Mireles*, 9 S.W.3d at 131; *Tex. Health Facilities Comm'n*, 665 S.W.2d at 452 ("The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency."). NWF argues that TCEQ nevertheless erred in concluding that Upper Trinity's plan complied with section 11.085($l$)(2) because: (1) TCEQ's reliance upon Report 362 and the Region C Water Plan was improper because they were not developed pursuant to Water Code section 11.1271(e), which required TCEQ to develop model conservation programs for different types of suppliers, (2) Gooch's testimony that Upper Trinity's plan complied with section 11.085($l$)(2) was conclusory; and (3) conflicting evidence demonstrates that TCEQ's decision was erroneous. We address each of these arguments in turn.

### a. Reliance on Report 362

 NWF argues that TCEQ's determination of whether a plan complies with section 11.085($l$)(2) must be based on recommendations developed in response to Water Code section 11.1271(e). It argues that Report 362 and the Region C Water Plan were not developed in response to Water Code section 11.1271(e) and therefore do not suffice.

Section 11.1271(e) directs that TCEQ and the Water Development Board:

shall develop model water conservation programs for different types of water suppliers that suggest best management practices for achieving the highest practicable levels of water conservation and

efficiency achievable for each specific type of water supplier.

Tex. Water Code § 11.1271(e); *see* Act of May 28, 2003, 78th Leg., R.S., ch. 688, § 1, 2003 Tex. Gen. Laws 2116 (enacting section 11.1271). NWF argues that TCEQ was required to assess whether an applicant has met the requirements of section 11.085($l$)(2) by reference to programs developed pursuant to section 11.1271(e). NWF argues TCEQ and the Water Development Board never developed water conservation programs as required by section 11.1271(e) and TCEQ should not be permitted to fill this void by relying upon Report 362 or the Region C Water Plan instead. Appellants argue that Report 362 was adopted pursuant to section 11.1271(e). Alternatively, they argue that even if Report 362 does not satisfy section 11.1271(e), TCEQ was entitled to consider Report 362, the Region C Water Plan, and any other information it deemed relevant to the section 11.085($l$)(2) determination, because section 11.085($l$)(2) does not specify what TCEQ should rely upon in determining whether section 11.085($l$)(2) is satisfied.

We agree with appellants that the salient issue is not whether Report 362 satisfied section 11.1271(e), but rather, whether substantial evidence supports TCEQ's decision to grant the permit. Even if Report 362 did not satisfy the directive of section 11.1271(e), it does not follow that TCEQ erred by considering it in making the section 11.085($l$)(2) determination. Section 11.085($l$)(2) does not specify what TCEQ must or may rely upon in determining whether an applicant has developed a satisfactory conservation plan, and NWF acknowledges that Report 362 is relevant to the section 11.085($l$)(2) inquiry. TCEQ could, in its own judgment, determine that the information in Report 362 was relevant to and supported a determination that Upper Trinity's application applicant would result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction.

Accordingly, we conclude that TCEQ did not err in relying upon Report 362 in assessing whether Upper Trinity met the requirements of section 11.085($l$)(2).

#### b. Reliance on the Region C Water Plan

 NWF argues that TCEQ erred by relying upon the Region C Water Plan to determine whether Upper Trinity complied with section 11.085($l$)(2) because no TCEQ rule or Water Code provision directs TCEQ to consider regional water plans to determine section 11.085($l$)(2) compliance. NWF argues that the Region C Water Plan was designed for all suppliers, including those who are not facing the heightened standard of section 11.085($l$)(2), and therefore its recommendations regarding conservation practices do not satisfy section 11.085($l$)(2). But the record does not reflect that TCEQ concluded that Upper Trinity's plan met the requirements of section 11.085($l$)(2) based solely on the fact that the plan complied with recommendations in the Region C Water Plan. Instead, the record shows that TCEQ considered the recommendations of the Region C Water Plan, along with other evidence and fact and expert testimony, to determine that Upper Trinity had met its section 11.085($l$)(2) obligation. Accordingly, this argument is unpersuasive and we conclude that TCEQ did not err in relying upon the Region C Water Plan in assessing whether Upper Trinity met the requirements of section 11.085($l$)(2).

#### c. Gooch's testimony

 NWF argues that TCEQ erred by relying upon Gooch's testimony that Upper Trinity's plan complied with section

11.085($l$)(2) because his testimony on this point was conclusory. We disagree. Gooch did not merely state that the plan complied with section 11.085($l$)(2), as NWF suggests. Instead, he testified regarding his experience with and knowledge of the requirements of section 11.085($l$)(2), his review of Upper Trinity's conservation plan, and the measures that were included in the plan. Thus, NWF's characterization of Gooch's testimony as conclusory is inaccurate. *See, e.g., Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 114 (Tex. App.–San Antonio 2011, pet. denied) (opinion testimony is not conclusory when it is based on underlying facts and analysis).

### d. Conflicting evidence

■■■ NWF contends that conflicting evidence demonstrates that TCEQ erred in concluding that Upper Trinity met the requirements of section 11.085($l$)(2). In particular, NWF argues that TCEQ should have discounted Gooch's testimony and the other evidence introduced by Upper Trinity and TCEQ because it conflicted with the testimony of Chris Brown, NWF's water conservation expert. Brown opined that the plan "would not result in the highest practicable levels of water conservation for a wholesale water agency." Brown testified that there were a number of bases for his opinion, including:

- The consultants who wrote Report 362 were not charged with defining the highest practicable levels of water conservation and efficiency achievable for specific types of water suppliers;
- The BMPs in Report 362 do not represent the highest practicable levels of water conservation and efficiency achievable for each specific type of supplier because they were developed via consensus, were only

the most common practices used at the time, and were voluntary;
- Upper Trinity's conservation plan was "weak" because:
 - It "has neither a regional program offered to end users on behalf of its retail customers, nor does it have a set of rules requiring retailers to implement specific programs and report on their progress over time;"
 - It only incorporates some of the BMPs from Report 362 and does not have quantifiable measures to track progress;
 - It does not include an incentive program for retail end users;
 - Its contractual requirements that its customers comply with its conservation plan and implement conservation plans are not specific enough and will result in uneven application;
 - The plan should be more specific in both scope and scheduling in order to be effective.

NWF argues that Brown's testimony conflicts with Gooch's, Taylor's, and other evidence submitted on behalf of Upper Trinity, and that Brown's testimony is more credible than the other evidence. But only TCEQ may "determine[] the meaning, weight, and credibility to assign [to this] conflicting evidence." *See Cty. of Reeves*, 266 S.W.3d at 528. Thus, it was within TCEQ's discretion to discount Brown's testimony and to credit the conflicting testimony and evidence. *See id.*

NWF also argues that Brown's testimony regarding Upper Trinity's failure to include two measures in its conservation plan—a coin-operated clothes washer rebate program and landscape irrigation restrictions—or explain its failure to include these measures, is "fatal" to a finding that

Upper Trinity complied with section 11.085($l$)(2). Although Brown criticized Upper Trinity's plan for not including these measures, NWF did not present any evidence regarding the magnitude of the effect that inclusion of these measures would have on the ultimate level of conservation and efficiency achieved by Upper Trinity's plan. Moreover, Gooch acknowledged that Upper Trinity's plan did not include a coin-operated clothes washer rebate program, yet nonetheless opined that the plan would result in the highest practicable levels of conservation and efficiency achievable. And Upper Trinity's plan did include recommendations regarding landscape irrigation restrictions—NWF simply argues that the restrictions should have been more stringent. But both Gooch and the technical memorandum authored by Wang concluded that the plan, as written, would result in the highest practicable levels of conservation and efficiency achievable. As with Brown's other testimony, only TCEQ may "determine[ ] the meaning, weight, and credibility to assign [to this] conflicting evidence." *See id.* It was within TCEQ's discretion to resolve this conflicting evidence and we may not substitute our judgment for that of TCEQ. *See Mireles*, 9 S.W.3d at 131.

In sum, considering the record evidence and having resolved NWF's complaints regarding the applicable law and the evidence, there is more than a scintilla of evidence based upon which reasonable minds could have found that Upper Trinity developed a plan that complied with section 11.085($l$)(2). *See id.*; *Tex. Health Facilities Comm'n*, 665 S.W.2d at 453; *City of El Paso*, 883 S.W.2d at 184. Accordingly, we must affirm TCEQ's finding that Upper Trinity developed a plan that complied with section 11.085($l$)(2). *Mireles*, 9 S.W.3d at 131; *see Slay*, 351 S.W.3d at 549 ("even if the evidence actually preponderates against" TCEQ's decision, appellate court

must uphold it "so long as enough evidence suggests [its] determination was within the bounds of reasonableness").

**2. Implementation of plan**

■ NWF argues that there was no evidence that Upper Trinity implemented a conservation plan that met the requirements of section 11.085($l$)(2).

The parties agree that there is a two-step inquiry that must be made under section 11.085($l$)(2): TCEQ must first conclude that the applicant has developed a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within its jurisdiction. TCEQ must then assess whether the plan has been implemented. *See* TEX. WATER CODE § 11.085($l$)(2). However, the parties disagree about the nature of the implementation requirement. NWF argues that a finding that a plan has been implemented requires evidence that, based on the ongoing implementation of the plan, the levels of conservation and efficiency targeted by the plan will be accomplished. Thus, NWF argues that Upper Trinity was required to present evidence that it had fully implemented the conservation plan in a way that was resulting in the highest practicable levels of water conservation and efficiency achievable by it. Appellants, on the other hand, argue that the second step requires evidence that the applicant has put the properly-developed plan in place.

■ The statute does not define the term "implemented," so we look to its common, ordinary meaning. *See Sw. Royalties*, 500 S.W.3d at 405. "Implement" is defined as "to give practical effect to and ensure of actual fulfillment by concrete measures." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 624. Moreover, the common, ordinary meaning of "plan," is "to devise or project the realization or achievement of." *Id.* at

947. The plain meaning of the text of section 11.085($l$)(2) thus is forward-looking with respect to the results of the conservation plan. It requires that the applicant have "implemented a water conservation plan that *will* result in the highest practicable levels of water conservation ...." TEX. WATER CODE § 11.085($l$)(2) (emphasis added). The Legislature could have used the term "*is* resulting"—but it did not. *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."). NWF's attack on whether the mechanisms for enforcing the conservation plan were sufficient is thus in substance an attack on whether the plan as developed met the statutory criteria, and not on whether the plan had been implemented. We have already concluded that TCEQ finding that Upper Trinity developed a plan meeting section 11.085($l$)(2)'s requirement was supported by substantial evidence, did not violate a statutory provision, and was not an abuse of discretion or arbitrary and capricious.

By the time TCEQ reaches the second step of the section 11.085($l$)(2) inquiry and is making a determination of whether the conservation plan has been implemented, it has already determined that the plan, as developed, "will result" in the highest practicable levels of water conservation. TEX. WATER CODE § 11.085($l$)(2). If the plan did not contain sufficient enforcement measures, then the plan would not meet the "developed" requirement. Accordingly, applying the plain meaning of the term "implemented" to require evidence that the conservation plan has been formally adopted by the applicant—a concrete measure that gives practical effect to the plan and ensures its fulfillment—is a straightforward interpretation of the text that does not lead to absurd results. *See Marks*, 319 S.W.3d at 663. And TCEQ has a rule that governs how wholesale water suppliers like Upper Trinity demonstrate implementation of their conservation plans. Section 288.5(1)(H) of the Administrative Code provides that implementation of a plan "shall be evidenced by a copy of the ordinance, rule, resolution, or tariff, indicating official adoption of the water conservation plan by the water supplier ...." 30 TEX. ADMIN. CODE § 288.5(1)(H). The evidence admitted at the hearing included a resolution by Upper Trinity's Board of Directors officially adopting the conservation plan. NWF does not dispute that Upper Trinity has officially adopted the plan.

Thus, there is more than a scintilla of evidence based upon which reasonable minds could have concluded that Upper Trinity had not only developed but also had implemented a plan that complied with section 11.085($l$)(2). *See Mireles*, 9 S.W.3d at 131; *Tex. Health Facilities Comm'n*, 665 S.W.2d at 453. Because substantial evidence supports this conclusion, we must affirm TCEQ's finding that Upper Trinity implemented a plan that complied with section 11.085($l$)(2). *Mireles*, 9 S.W.3d at 131; *see Slay*, 351 S.W.3d at 549 ("even if the evidence actually preponderates against" TCEQ's decision, appellate court must uphold it "so long as enough evidence suggests [its] determination was within the bounds of reasonableness").

Because substantial evidence supports TCEQ's section 11.085($l$)(2) finding, we sustain Upper Trinity's first issue, and we sustain TCEQ's first and second issues as they relate to TCEQ's section 11.085($l$)(2) finding.

### C. Chapter 288 of the Texas Administrative Code

NWF also contends that TCEQ erred in concluding that Upper Trinity complied

with Administrative Code section 288.5(1)(B) and (H). 30 Tex. Admin. Code § 288.5. Upper Trinity contends that NWF did not preserve error regarding its chapter 288 arguments, and both appellants contend that even if error was preserved, TCEQ's findings are supported by substantial evidence.

### 1. Section 288.5(1)(B)

NWF argues that TCEQ erred in determining that Upper Trinity's conservation plan included the basis for the development of its five- and ten-year targets as required by Administrative Code Section 288.5(1)(B). Section 288.5(1)(B) provides that all water conservation plans for wholesale water suppliers must include:

specific, quantified five-year and ten-year targets for water savings including, where appropriate, target goals for municipal use in gallons per capita per day for the wholesaler's service area, maximum acceptable water loss, and the basis for the development of these goals.

30 Tex. Admin. Code § 288.5(1)(B). Upper Trinity contends that NWF did not preserve its complaint regarding this issue because it failed to raise it in its motion for rehearing filed with TCEQ. We agree.

A motion for rehearing in an administrative proceeding is a statutory prerequisite to appeal in a contested case. Tex. Gov't Code § 2001.145(a). The purpose of a motion for rehearing is to apprise the agency of the claimed error and allow the agency the opportunity to correct the error or prepare to defend against it. *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 365 (Tex. 1983); *Hill v. Board of Trs. of the Ret. Sys. of Tex.*, 40 S.W.3d 676, 678 (Tex. App.–Austin 2001, no pet.). To preserve error, an appealing party must first raise the issue in its motion for rehearing before the agency. *See Hill*, 40 S.W.3d at 679. The motion must

set forth: (1) the particular finding of fact, conclusion of law, ruling, or other action by the agency which the complaining party asserts was error; and (2) the legal basis upon which the claim of error rests. *Burke v. Central Educ. Agency*, 725 S.W.2d 393, 397 (Tex. App.–Austin 1987, writ ref'd n.r.e.). The standard is one of fair notice. *See id.*

NWF did not mention Section 288.5(1)(B), the legal basis for this challenge, in its motion for rehearing, nor did it mention Upper Trinity's five- and ten-year targets. *See id.* Accordingly, NWF has not preserved error regarding its complaint based upon Section 288.5(1)(B). *See id.*

### 2. Section 288.5(1)(H)

NWF contends that TCEQ erred in determining that Upper Trinity's plan contained a sufficient description of the authority by which it would implement and enforce the plan as required by Administrative Code section 288.5(1)(H). Section 288.5(1)(H) provides that all water conservation plans for wholesale water suppliers must include:

a means for implementation and enforcement, which shall be evidenced by a copy of the ordinance, rule, resolution, or tariff, indicating official adoption of the water conservation plan by the water supplier; and a description of the authority by which the water supplier will implement and enforce the conservation plan . . . .

30 Tex. Admin. Code § 288.5(1)(H). Upper Trinity contends that NWF waived this issue. Both appellants also contend that if not waived, substantial evidence supports TCEQ's finding that the plan sufficiently describes the authority by which Upper Trinity will implement and enforce it.

NWF acknowledges that the record contains a copy of Upper Trinity's Board's

resolution officially adopting its conservation plan, but it argues that the plan does not sufficiently describe the authority by which Upper Trinity will implement and enforce the plan. However, the plan includes a description of the means by which Upper Trinity will implement and enforce the plan and the limitations on its enforcement powers. The plan explains that Upper Trinity is a wholesale water supplier, which means that it does not have a "direct relationship with [retail] customers" or "ordinance or policy power over such customers," and thus has "limited control or influence over the use of water" purchased by retail customers. The plan explains that Upper Trinity will enforce the plan by requiring its wholesale customers to contractually agree to cooperate in the implementation of the plan and to implement their own conservation plans in addition to Upper Trinity's plan if requested to do so by Upper Trinity. The plan also authorizes Upper Trinity's Executive Director to implement and enforce the plan and provides that Upper Trinity will prepare yearly reports to monitor its compliance with the plan.

NWF argues that more evidence—like the penalties Upper Trinity will impose for contractual non-compliance—is needed to satisfy section 288.5(1)(H). But we conclude that reasonable minds could have reached the conclusion that Upper Trinity's plan included a "description of the authority by which [it] will implement and enforce the conservation plan" based upon the plan's provisions described above. 30 Tex. Admin. Code § 288.5(1)(H); *see Tex. Health Facilities Comm'n*, 665 S.W.2d at 453 (appellate court must sustain TCEQ's decision if evidence is such that reasonable

minds could have reached the conclusion TCEQ must have reached in order to justify its action).

We sustain Upper Trinity's second issue, and we sustain TCEQ's first and second issues as they relate to its section 288.5(1)(B) and 288.5(1)(H) findings.

Because we have concluded that none of NWF's grounds challenging TCEQ's order are meritorious, we reverse the district court's judgment and render judgment affirming TCEQ's order.

### Conclusion

We reverse the district court's judgment and render judgment affirming TCEQ's order.[3]

---

3. Because we are reversing the district court's judgment and rendering judgment affirming TCEQ's order, we do not reach Upper Trinity's third issue regarding whether NWF demonstrated that its substantial rights had been prejudiced, because doing so would afford Upper Trinity no greater relief.