# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00037-CV

---

**Judd Kearl, Appellant**

**v.**

**Texas Racing Commission, Appellee**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-000428, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This is a suit for judicial review of the Texas Racing Commission's order disciplining horse trainer Judd Kearl after several of his horses tested positive for a prohibited substance following races. The Commission suspended Kearl's license for fourteen years and fined him $85,000. Kearl appeals from the district court's judgment affirming the Commission's order. We will affirm.

## BACKGROUND

Racing Act and Commission Rules

We begin with an overview of the relevant statutory framework, the Texas Racing Act. The legislature has granted the Commission broad authority to "license and regulate all aspects of horse racing and greyhound racing in this state," Tex. Occ. Code § 2023.001(a), including the authority to adopt rules administering the Act, *see id.* §§ 2023.003–.004. Further,

the Commission may impose penalties for violations of the Act or Commission rules, including suspension or revocation of occupational licenses and administrative penalties. *See id.* §§ 2033.051 (authority to impose administrative penalties), .151 (revocation or suspension of licensure).

The Act provides for a board of three stewards (Board) at each racetrack to supervise horse races. *Id.* § 2023.101(a). The Board's duties include "general authority and supervision over the conduct of each race and licensees at a racetrack." 16 Tex. Admin. Code § 313.22(a) (2005) (Tex. Racing Comm'n, General Duties).[1] It is also authorized to "interpret and enforce the Act and the Rules" and to "issue rulings." *Id.* § 313.22(b)(1)–(2). It has authority to investigate potential violations of the Act or Commission rules by a licensee, to charge a licensee with a violation, to conduct a disciplinary hearing, and to impose fines and suspend licenses. *Id.* § 307.61(a) (2002) (General Authority); *see generally id.* §§ 307.62–.69 (specifying various aspects of disciplinary hearings before board of stewards). "A person aggrieved by a ruling of the stewards or racing judges may appeal to the Commission." *Id.* § 307.67(a) (2012) (Appeal to the Commission).

The Commission has adopted rules providing that a "horse or greyhound participating in a race may not carry in its body a prohibited drug, chemical, or other substance." *Id.* § 319.3(a) (2019) (Medication Restricted). Unless specifically authorized by the rules, "a person may not administer or cause to be administered to a horse or greyhound a prohibited drug, chemical, or other substance" by any means "during the 24-hour period before the post time for the race in which the animal is entered." *Id.* § 319.3(d). The rules require a person who has

---

[1] All citations to the Texas Administrative Code are to rules promulgated by the Texas Racing Commission.

"care and custody of a race animal" before a race to guard the animal "in the manner and for the time necessary to prevent the administration of a prohibited drug, chemical, or other substance." *Id.* § 319.302 (1998) (Reasonable Diligence Required). The rules further provide that a trainer is the "absolute insurer" that a horse or greyhound "that runs a race while in the care and custody of the trainer . . . is free from all prohibited drugs, chemicals, or other substances." *Id.* § 311.104(b)(2) (2018) (Trainers).

To enforce these provisions, Commission rules require post-race testing of certain horses. *See id.* § 319.361 (1998) (Testing of Horses). The specimen must be taken inside a test barn at the racetrack that meets certain conditions. *Id*. § 309.250 (2008) (Test Barn). After staff take a sample, the Commission veterinarian "divide[s] the specimen into two parts." *Id.* § 319.362(a) (2002) (Split Specimen). One part is sent to a laboratory for testing while the veterinarian retains the other—called the split sample—for possible future testing. *Id.* § 319.362(b). "A positive finding by a chemist of a prohibited drug, chemical, or other substance in a test specimen of a horse or greyhound collected on the day of a race, subject to the rules of the commission relating to split specimens, is prima facie evidence" of a violation. *Id.* § 319.3(e). The animal's owner or trainer may request that the split specimen "be submitted for testing to a Commission approved and listed laboratory that is acceptable to the owner or trainer." *Id.* § 319.362(c). "If the test on the split specimen confirms the findings of the original laboratory, it is a prima facie violation of the applicable provisions of the chapter." *Id.* § 319.362(e). But if the test on the split sample "does not substantially confirm the findings of the original laboratory, the stewards may not take disciplinary action regarding the original test results." *Id.* § 319.362(f).

3

Procedural Background

In May and June of 2017, samples from five of Kearl's horses tested positive for nomifensine, a prohibited substance, following races at Retama Park and Sam Houston Race Park. The parties agreed that all cases would be heard by the Retama Park Board of Stewards (Retama Board). Kearl requested testing of the split samples at the Pennsylvania Equine Toxicology and Research Lab. All split samples tested positive for nomifensine.

The Retama Board held a hearing on the merits on September 25–27 of 2017. In a disciplinary proceeding before the Board, "[t]he burden of proof is on the person bringing the complaint to show, by a preponderance of the evidence, that the licensee has violated or is responsible for a violation of the Act or a Commission rule." *Id.* § 307.62(e). The Commission had the burden to prove that: (1) a person administered or caused to be administered nomifensine to a horse, (2) nomifensine is a prohibited substance under the Commission's rules, and (3) the trainers were responsible for the horses under the absolute insurer rule. *See id.* §§ 319.3(d)–(e); 311.104(b)(2).

To establish the first element, the Commission relied on laboratory reports documenting that the blood specimens taken from the horses—both the preliminary sample and the split sample in each case—tested positive for nomifensine. Kearl argued that the test results were unreliable because the samples were not taken and stored according to the Commission's written procedures. At the time, the Commission required test barn employees to follow uniform procedures set out in a document entitled Horse Racetrack Drug Testing Procedures (Drug Testing Procedures). The test barn supervisors, Edna Griswold at Sam Houston Race Park and Laura Hoffman at Retama Park, testified that they were orally instructed to modify certain aspects of these procedures in all cases.

Griswold testified that at the instruction of the Commission's executive director, her employees deviated from the Drug Testing Procedures as follows:

| Provision | Procedure | Deviation |
|---|---|---|
| 6.5.12 | Collect four tubes of blood from each horse | Collected three tubes |
| 6.5.21 | Harvest the serum from the blood | Did not harvest the serum |
| 6.5.22 | Use evidence tape to tape the blood tubes | Used rubber bands |
| 6.6.12 | Store split samples in lockable freezer | Stored samples in refrigerator |
| 6.6.13 | Only test barn supervisors shall have keys to locked freezer where samples are stored. | Samples stored in a refrigerator. No need to secure a key to a freezer. |

Hoffman testified that her staff deviated from the following portions of the Drug Testing Procedures in three respects:

| Provision | Procedure | Deviation |
|---|---|---|
| 6.5.12 | Collect four tubes of blood from each horse | Collected three tubes |
| 6.5.21 | Harvest the serum from the blood | Did not harvest the serum |
| 6.6.13 | Only test barn supervisors shall have keys to locked freezer where samples are stored. | Two security officers had keys to the freezer where samples were stored. |

Hoffman testified that "the chief medical examiner at the time" told her to stop following these three provisions. We will refer to the oral instructions given to both supervisors as the "Test Barn Instructions."

The second element required the Commission to show that nomifensine is a prohibited substance. *See* 16 Tex. Admin. Code § 319.1(b)(1) (2015) (Purpose and Definitions) (defining "prohibited drugs, chemicals, or other substances"). The Commission's expert, Dr. Scott Stanley, a professor of equine analytical chemistry, testified that nomifensine meets this definition.

Regarding the final element, Kearl did not dispute the horses were in his "care and custody" for purposes of the absolute insurer rule. Instead, he argued that he did not know,

5

and had no reason to know, that the horses carried nomifensine in their bodies. He asserted that Dr. Justin Robinson—the veterinarian Kearl employed to care for the horses—administered the nomifensine without his knowledge or consent. As proof, Kearl presented the testimony of his former counsel, Darrell J. Vienna, who testified that Dr. Robinson admitted to administering the nomifensine. The Commission responded that Kearl's knowledge or lack of it is irrelevant under the absolute insurer rule.

Approximately a month later, the Retama Board issued rulings concluding that the Commission had proven its case against Kearl.[2] The Retama Board acknowledged that the test barn employees did not strictly follow the Drug Testing Procedures but decided that "none of these issues compromised the sufficiency of the chain of custody of these specimens, and that no evidence whatsoever was introduced that the specimens were tampered with or that the results were unreliable." Regarding the second element, the Retama Board expressly found Dr. Stanley's testimony that nomifensine is a prohibited substance to be credible. Finally, the Retama Board found that "the totality of the evidence is that [Dr. Robinson] was responsible for the administration of nomifensine to all of the horses in question." Accepting Kearl's testimony that he was ignorant of Dr. Robinson's actions, the Retama Board concluded that "ignorance does not relieve [Kearl] of responsibility" under the absolute insurer rule. The Retama Board suspended Kearl's license for nineteen years and fined him $110,000.

Kearl appealed the Board's decision to the Commission. While the appeal was pending, Kearl sued the Commission under Section 2001.038 of the Administrative Procedures Act (APA), which authorizes declaratory judgment claims against a state agency over the

---

[2] The Retama Board issued a separate ruling and punishment for each horse that tested positive. We quote from passages that are identical in each ruling.

validity or applicability of a "rule." Tex. Gov't Code § 2001.038. He contended that the Test Barn Instructions constitute rules under the APA and that they are invalid because the Commission did not follow notice-and-comment procedures. *See id.* §§ 2001.003(6) defining "rule"), .035(a) ("A rule is voidable unless a state agency adopts it in substantial compliance with" statutory rulemaking procedures.). He further asked the court to declare that "all administrative actions premised upon the collected samples" are invalid. The district court granted partial relief and declared "that the instructions to the test barn supervisors at issue in this case, but not any underlying Texas Racing Commission policies or rules, are hereby held to be INVALID" but refused to invalidate the Commission's actions based on those samples. That judgment has become final.

Meanwhile, the Commission referred the appeal to the State Office of Administrative Hearings (SOAH) for a contested case hearing. *See* 16 Tex. Admin. Code § 307.67(c) ("A hearing on an appeal from a ruling by the stewards or racing judges is a contested case and shall be conducted by SOAH in accordance with the Rules regarding contested cases."). Kearl bore the burden on appeal to demonstrate that the Retama Board's "decision was clearly in error." *See id.* An administrative law judge (ALJ) from SOAH held an evidentiary hearing in January of 2019. The ALJ issued a proposal for decision (PFD) concluding that Kearl had not met his burden before the Commission and recommending that the Commission uphold the Retama Board's rulings.

In September of 2019, the Commission considered the PFD at a public hearing. The Commission subsequently issued an order adopting the PFD's findings and conclusions as to liability but reducing Kearl's suspension to fourteen years and his fine to $85,000 (Disciplinary Order). Kearl filed a motion for rehearing that was overruled by operation of law, and then

timely filed suit for judicial review in Travis County district court. *See id.* § 307.39 (2002) (Judicial Review) ("In accordance with Government Code, § 2001.171, a person who is aggrieved by an order of the Commission in a contested case proceeding and who has exhausted all administrative remedies is entitled to judicial review."). The district court affirmed the Disciplinary Order, and Kearl appealed.

## STANDARD OF REVIEW

"Judicial review of a commission order is under the substantial evidence rule." Tex. Occ. Code § 2023.009(a). Under this standard, a reviewing court shall reverse and remand the case "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

> (A) in violation of a constitutional or statutory provision;
>
> (B) in excess of the agency's statutory authority;
>
> (C) made through unlawful procedure;
>
> (D) affected by other error of law;
>
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2). The reviewing court presumes the agency's order, findings, inferences, conclusions, and decisions are valid, and the burden is on the contestant to demonstrate otherwise. *Jenkins v. Crosby Indep. Sch. Dist.*, 537 S.W.3d 142, 149 (Tex. App.—Austin 2017, no pet.) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)). Whether an agency's order satisfies this standard is a

8

question of law.  *Personal Care Prods., Inc. v. Smith*, 578 S.W.3d 262, 266 (Tex. App.—Austin 2019, no pet.).  We apply this analysis without deference to the trial court's judgment.  *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam); *see Heritage on San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied) ("On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the agency's decision.").

Several of Kearl's arguments turn on the meaning of the Act or Commission rules.  "Statutory interpretation involves questions of law that we consider de novo, even when reviewing agency decisions." *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019).  Our goal in construing a statute is to ascertain and give effect to the legislature's intent. *Id.*  We begin by examining "the plain and common meaning of the statute's words." *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020).  "When the words read in context are clear, they determine intent; a court must never rewrite them under the guise of interpretation." *Id.*  We construe administrative rules according to the same principles. *Patients Med. Ctr. v. Facility Ins.*, 623 S.W.3d 336, 341 (Tex. 2021).

## DISCUSSION

Kearl presents what we construe as six issues on appeal:  (1) the Commission erred by disciplining him based on invalid test results, (2) the Commission improperly shifted the burden of proof to him, (3) the Retama Board required him to meet an "unlawful evidentiary requirement," (4) Dr. Stanley's testimony is not competent evidence, (5) the Commission acted arbitrarily and capriciously by imposing excessive penalties, and (6) the absolute insurer rule is unconstitutional as applied to him.

9

*Validity of the Test Results*

First, Kearl argues that there are "no valid test results" on the blood samples taken from his horses because they were collected pursuant to the Test Barn Instructions. He reasons that if the samples were collected through an unlawful procedure, it "necessarily means that results of testing on samples collected and stored pursuant to the [Test Barn] Instructions are likewise invalid." He argues that these results necessarily fail to satisfy Commission rules that require a positive test on both the initial and split samples. The Commission therefore engaged in an unlawful procedure by disciplining him based on these results. *See* Tex. Gov't Code § 2001.174(2)(C) (authorizing reversal if order "made through an unlawful procedure"). And, according to Kearl, the invalidity of the test results means the Disciplinary Order is not reasonably supported by substantial evidence in the record. *See id.* § 2001.174(2)(E). The Commission responds that Kearl waived this argument. In the alternative, the Commission argues that Subsection 2001.174(2)(C) is inapplicable and that the test results are not invalid in any event.

We begin by determining whether Kearl waived this issue. A participant in an administrative hearing "must properly object to admission of evidence to preserve error for appeal." *Texas Dep't of Fam. and Protective Servs. v. K.G.,* No. 01-20-00315-CV, 2022 WL 243193, at *6 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet.) (mem. op.) (citing *Texas State Sec. Bd. v. Miller*, No. 03-06-00365-CV, 2009 WL 1896075, at *2 (Tex. App.—Austin July 1, 2009, no pet.) (mem. op.)). The Commission is correct that Kearl did not object when the test results were offered into evidence before the Board and before the ALJ on appeal. Kearl does not assert the test results are inadmissible. Instead, he argues that the Commission could not lawfully discipline him based on the results. *Cf. City of Keller v. Wilson*,

10

168 S.W.3d 802, 810 (Tex. 2005) (explaining that evidence is insufficient when "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact"). Kearl made that argument to the Board, the ALJ, and in his motion for rehearing filed with the Commission. *See Upper Trinity Reg'l Water Dist. v. Nat'l Wildlife Fed'n*, 514 S.W.3d 855, 870 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("To preserve error, an appealing party must first raise the issue in its motion for rehearing before the agency."). Kearl therefore preserved this issue for review.

Next, the Commission argues that Subsection 2001.174(2)(C) "is simply inapplicable to the facts at issue." More specifically, the Commission construes "unlawful procedure" to refer to "the procedure used to create the decision, not the procedure used to collect evidence in support of a decision." As examples of permissible challenges, the Commission cites several decisions from this Court involving challenges to the legality of the procedure by which an agency made its final decision. *See, e.g.*, *Jaguar Land Rover N. Am. v. Bd. of Tex. Dep't of Motor Vehicles*, No. 03-16-00770-CV, 2017 WL 6756997, at *7 (Tex. App.—Austin Dec. 21, 2017, no pet.) (mem. op.) (concerning agency's failure to comply with SOAH summary disposition rules); *Malone v. Public Util. Comm'n of Tex.*, No. 03-11-00815-CV, 2013 WL 4820454, at *3–4 (Tex. App.—Austin Aug. 28, 2013, no pet.) (mem. op.) (challenging agency's compliance with statutory procedure for changing ALJ's finding of fact); *Lone Star R.V. Sales, Inc. v. Motor Vehicle Bd.*, 49 S.W.3d 492, 496 (Tex. App.—Austin 2001, no pet.) (determining whether agency erred by considering untimely exception). We agree that Subsection 2001.174(2)(C) applies to the procedures an agency employs in adjudicating a dispute. That is what Kearl alleges: that the Commission acted unlawfully by disciplining him based on purportedly invalid test results. In other words, he argues that the Commission's

"findings, inferences, conclusions, or decisions" were "made through an unlawful procedure." *See* Tex. Gov't Code § 2001.174(2)(C). We reject the Commission's argument that Section 2001.174(2) does not apply here.

However, we agree with the Commission that the test results are not invalid per se. Kearl argues that tests on samples collected through an unlawful procedure—the Test Barn Instructions—are necessarily invalid because the Commission said as much. The Drug Testing Procedures provide, "strict laboratory procedures and an irreproachable Chain of Custody are necessary to maintain the integrity of drug testing results for use as evidence in legal proceedings." Another section admonishes employees to "pay close attention to everything you do in the process of collecting a sample" because, if a positive result is challenged, "we must be able to testify in a court of law that the sample was collected in a certain manner because we ALWAYS follow standard procedures" (emphasis in original). Based off these passages, Kearl contends that departures from the Drug Testing Procedures "created nonconforming split samples" that cannot "substantially confirm[]" the preliminary test results. *See* 16 Tex. Admin. Code § 319.362(f) (prohibiting discipline based on preliminary test results "[i]f the test on the split specimen portion does not substantially confirm the findings of the original laboratory").

We disagree. Rule 319.362 directs the Commission veterinarian to divide the sample into two parts and send one part off for testing. *Id.* § 319.362(a). It further provides:

> (b) The commission veterinarian or commission veterinarian's designee shall retain custody of the portion of the specimen that is not sent to the laboratory. The veterinarian or designee shall store the retained part in a manner that ensures the integrity of the specimen.
>
> . . . .
>
> (d) If the retained part of a specimen is sent for testing, the commission staff shall arrange for the transportation of the specimen in a manner that ensures the

integrity of the specimen. The person requesting the tests shall pay all costs of transporting and conducting tests on the specimen. To ensure the integrity of the specimen, the split specimen must be shipped to the selected laboratory no later than 10 days after the day the trainer is notified of the positive test.

(e) If the test on the split specimen confirms the findings of the original laboratory, it is a prima facie violation of the applicable provisions of the chapter.

(f) If the test on the split specimen portion does not substantially confirm the findings of the original laboratory, the stewards may not take disciplinary action regarding the original test results.

*Id.* § 319.362(b), (d)–(f). The rule requires that the test on the split sample "substantially confirm the findings of the original laboratory," i.e., the original positive test. *See id.* § 319.362(f). It does not make confirmation dependent on whether the sample was taken, stored, or shipped in compliance with other Commission procedures. Construing Rule 319.362 as a whole, we conclude that it does not prohibit the Commission from considering the test results.[3] *See Patients Med. Ctr.*, 623 S.W.3d at 341 (observing that "administrative rules, like statutes, should be analyzed 'as a cohesive, contextual whole'" (quoting *Sommers for Alabama & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017))).

Kearl maintains that the Drug Testing Procedures are the Commission's "pledge to the public about how and why it tests for prohibited substances" and asks us to hold the Commission to its word. *See First Fed. Sav. & Loan Ass'n v. Vandygriff*, 639 S.W.2d 492, 500 (Tex. App.—Austin 1982, writ dism'd) (finding implicit command in predecessor to APA "that administrative adjudications be conducted with procedural regularity independent of result").

---

[3] Rule 319.362 applies specifically to drug testing of horses. *See* 16 Tex. Admin. Code § 319.362. The Commission has promulgated another set of rules that apply to drug testing of racing animals generally. Rule 319.334 provides in essentially identical terms that the commission veterinarian or test barn supervisor "shall ensure that a specimen that is to be sent to a testing laboratory is delivered to the laboratory in a timely manner and by a method that ensures the integrity of the specimen." *Id.* § 319.334 (2003) (Delivery and Retention of Specimens).

We agree that "an agency may not decline to 'follow the clear, unambiguous language of its own regulation.'" *Patients Med. Ctr.*, 623 S.W.3d at 342 n.10 (quoting *Rodriguez v. Service Lloyds Ins.,* 997 S.W.2d 248, 255 (Tex. 1999)). But even if departing from the Drug Testing Procedures was itself unlawful, an issue we need not reach today, the APA requires a showing that unlawful procedure prejudiced the appellant's substantial rights.[4] *See* Tex. Govt Code § 2001.174(2); *Texas Comm'n on Envtl. Quality v. Maverick County*, 642 S.W.3d 537, 545 n.3 (Tex. 2022); *Rogers v. Texas Bd. of Architectural Exam'rs*, 390 S.W.3d 377, 388 (Tex. App.—Austin 2011, no pet.); *see also City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 264 (Tex. 2001) (holding in context of due process challenge to agency action that "failure to follow procedural requirements of statutes or rules is not reversible error without a showing of harm."). Kearl does not point to any evidence showing how the Commission's failure to follow its published procedures affected the accuracy of the positive test results or otherwise prejudiced his substantial rights.

---

[4] Although an agency is legally bound to follow its own rules, "[n]ot every statement by an administrative agency is a rule." *Teladoc, Inc. v. Texas Med. Bd.*, 453 S.W.3d 606, 621 (Tex. App.—Austin 2014, pet. denied) (citing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994)). The APA provides that "rule" means "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't Code § 2001.003(6)(A), (C). The parties do not expressly join issue over whether the Drug Testing Procedures are rules, but each treats them differently. Kearl treats the Drug Testing Procedures as rules describing the Commission's procedural requirements, while the Commission treats them as pertaining only to its internal management and procedures. We will assume without deciding that the Drug Testing Procedures are rules within the meaning of the APA because that classification does not affect our disposition of this issue. *See* Tex. R. App. P. 47.1.

We conclude that Kearl has failed to show the Disciplinary Order was made through an unlawful procedure or is not supported by substantial evidence. We overrule his first issue.

*Burden of Proof*

Kearl argues in his second issue that the Commission improperly shifted the burden of proof to him. In a proceeding before the Board, the "burden of proof is on the person bringing the complaint to show, by a preponderance of the evidence, that the licensee has violated or is responsible for a violation of the Act or a Commission rule." 16 Tex. Admin. Code § 307.62(e). If the licensee appeals the ruling to the Commission, the burden shifts to the licensee to prove that the "decision was clearly in error." *Id.* § 307.67(c). Kearl argues that the burden never shifted to him because the Commission failed to carry its burden. However, Rule 307.67 "unambiguously states that, in an appeal from a stewards' ruling, the appellant carries the burden of proof at SOAH." *Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 760 (Tex. App.—Austin 2006, pet. denied). Thus, even if Kearl had been correct about deficiencies in the Commission's case, it remained Kearl's burden to prove that on appeal to the Commission. *See* 16 Tex. Admin. Code § 307.67(c); *Pierce*, 212 S.W.3d at 760. We overrule Kearl's second issue.

*Evidentiary Standard*

In his third issue, Kearl argues that the Board required him to meet an "unlawful evidentiary standard." After reciting the various deviations from procedure by Commission employees, the Retama Board concluded that "none of these issues compromised the sufficiency of the chain of custody of these specimens, and no evidence whatsoever was introduced that the

15

specimens were tampered with or that the results are not reliable." Kearl argues that this improperly placed the burden on him to show that the tests results are unreliable when it is the Commission's burden to prove a violation. *See* 16 Tex. Admin. Code § 307.67(c).

We disagree. Commission rules provide, "If the test on the split specimen confirms the findings of the original laboratory, it is a prima facie violation of the applicable provisions of the chapter." *Id.* § 319.362(e). Prima facie evidence is "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding). "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). The tests on the split samples were all positive for nomifensine, the same substance found by the preliminary testing. Under the plain language of the rules, this is sufficient to carry the Commission's burden to show that Kearl's horses participated in races carrying nomifensine unless Kearl offered rebuttal evidence. The Board did not apply a new evidentiary standard but merely stated that Kearl failed to offer the rebuttal evidence required by rule.[5] *See* 16 Tex. Admin. Code § 319.362(e); *Pierce*, 212 S.W.3d at 754 ("Here, the Staff established a prima facie case that Kristy's Gold Star raced with a prohibited drug in her system, and Pierce offered no evidence to rebut it."). We overrule Kearl's fourth issue.

---

[5] Kearl nonetheless argues that requiring him to offer rebuttal evidence is improper because "[a]dherence to an unlawful procedure is not mooted just because an innocent licensee cannot demonstrate a probable impact on the outcome." As support for this argument, he cites a decision of our sister court. *See Texas Dep't of Pub. Safety v. Hutcheson*, 235 S.W.3d 312 (Tex. App.—Corpus Christi–Edinburg 2007, pet. denied). There, an ALJ reversed the suspension of Hutcheson's license, and our sister court affirmed. *Id.* at 313. Kearl argues that the *Hutcheson* court affirmed solely because of the agency's failure to follow procedure. We disagree. The court affirmed because it concluded that the agency is required to show compliance with a specific procedural requirement as part of its burden of proof. *See id.* at 315–16.

16

*Dr. Stanley's Testimony*

Kearl argues in his fifth issue that the Commission's finding that "nomifensine is a prohibited substance" is not supported by substantial evidence. Kearl argues that Dr. Stanley's testimony was unreliable and therefore "inadmissible" but the substance of Kearl's argument is that the testimony is incompetent evidence that does not support the Disciplinary Order. *Cf. Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009) ("[A] party may assert on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict[.]"). We will address his issue as a substantial-evidence challenge.

"Substantial evidence" review within the meaning of Subsection 2001.174(2)(e) is essentially "a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record." *Jenkins*, 537 S.W.3d at 149. Under this deferential standard, the reviewing court presumes the agency's order is supported by substantial evidence and the burden is on the contestant to show otherwise. *Id.* Substantial evidence "does not mean a large or considerable amount of evidence" but "requires only 'such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact.'" *Id.* (quoting *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied)). In fact, "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Personal Care Prods.*, 578 S.W.3d at 266 (citing *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)).

"Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338,

17

348 (Tex. 2015). Expert testimony is relevant if it is "sufficiently tied to the facts of the case" such that it will aid the trier of fact "in resolving a factual dispute." *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Expert testimony is reliable if it meets the six non-exclusive *Robinson* factors, *see id.* at 557, or if the trial court can otherwise confirm its reliability, *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 422 (Tex. 2020). But "[i]f an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Id.* at 422–23 (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (per curiam)).

Commission rules define prohibited drugs in relevant part as "any stimulants, depressants, tranquilizers, local anesthetics, drugs, other drug metabolites which could affect the health or performance of a race animal, however minimal, except as expressly permitted by this chapter[.]" 16 Tex. Admin. Code § 319.1(b)(1). Dr. Stanley, a professor of equine analytical chemistry, testified that nomifensine meets this definition. He explained that nomifensine works on the norepinephrine dopamine receptor in the brain and acts as a reuptake inhibitor. It increases the amount of two chemicals—norepinephrine and dopamine—and "results in potential stimulation."[6] Dr. Stanley explained that horses have "norepinephrine-dopamine receptor just like humans do, so in practice, that drug would react the same way with those receptors, causing the same effect." To support this opinion, he discussed several studies showing that horses have the same physiological response to drugs in this class as humans do. He also described FDA

---

[6] Nomifensine was originally used as an antidepressant in humans until the manufacturer withdrew it from the market because it caused "severe anemia" in some patients. The Food and Drug Administration withdrew its approval in 1992; it has never been approved for veterinary use.

guidelines which state that any drug whose effects have not been studied in animals could be detrimental.

Kearl argues that Dr. Stanley's testimony regarding nomifensine's effect on humans is "wholly irrelevant" to the question of whether it could affect the health of racing animals. But Dr. Stanley explained the connection: horses have the same norepinephrine-dopamine receptor as humans and would react the same way to drugs that affect it. He conceded that he had not personally studied the effects of nomifensine in horses and was not aware of such a study but discussed several studies showing that horses responded to drugs in the same class in the same way as humans. Nevertheless, Kearl maintains that Dr. Stanley could not testify as an expert because he "had no personal knowledge of [n]omifensine's effect on racehorses through his own tests, research, or studies, and he acknowledged that he knew of no one that had studied [n]omifensine in a horse." In other words, Kearl argues that an expert must always have personally performed a study on the exact question under dispute or reviewed such a study performed by others. We are aware of no authorities imposing such a high standard for reliability in this context, and Kearl cites none.[7] *See, e.g.*, *Gharda*, 464 S.W.3d at 349 ("Expert testimony is unreliable if there is too great an analytical gap between the data on which the expert relies and the opinion offered."); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904 (Tex. 2004) ("Expert testimony is unreliable if it is not grounded 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.'" (quoting *Robinson*, 923 S.W.2d at 557))). We overrule Kearl's fifth issue.

---

[7] Such a requirement could effectively heighten the Commission's burden of proof from showing that a prohibited substance "*could* affect the health or performance" of a horse, 16 Tex. Admin. Code § 319.1(b)(1) (emphasis added), to showing that it in fact had an effect.

*Arbitrary and Capricious*

Kearl argues in his sixth issue that the Commission acted arbitrarily and capriciously in assessing his punishment. *See* Tex. Gov't Code § 2001.174(2)(F). An agency's decision is arbitrary and capricious where, inter alia, it "failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *McClelland v. Texas Health & Human Servs. Comm'n*, 635 S.W.3d 410, 417 (Tex. App.— Houston [1st Dist.] 2021, no pet.) (citing *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994)).

The Commission's Equine Medication Classification Policy and Penalty Guidelines (Guidelines) divide prohibited substances into classes and provide "penalty recommendations" for five classes of violations. To further the goal of disciplining licensees in a "consistent and fair manner," the penalty recommendations must be followed "in all cases in the absence of persuasive, credible evidence of mitigating circumstances justifying a lesser penalty or aggravating circumstances justifying an enhanced penalty." The Guidelines further provide, "An example of mitigating circumstances is when the trainer presents credible evidence that another individual actually caused the horse to race with a prohibited substance in its system."

Nomifensine is not on the schedule, but the Guidelines state that any substance or drug not included "should be treated as Class 1 violations warranting a Class A penalty unless otherwise advised by the executive director." The Retama Board imposed the maximum punishment allowed for five Class 1 violations involving a Penalty A substance: a nineteen-year

20

suspension and $110,000 fine.[8] The Commission subsequently reduced the penalty to fourteen years' suspension and the fine to $85,000. Kearl argues that it should have reduced the penalty still further because it was Dr. Robinson—not Kearl—who administered the nomifensine. However, he also acknowledges that members of the Commission discussed these very matters at the meeting where they considered whether to adopt the PFD. Commissioners proposed reducing the suspension and fine out of concern that they were, in the words of one, "excessive [under] this particular unique set of facts." Kearl argues that the allegedly minimal reduction is unreasonable because the penalties still have "the effective result of terminating [his] career." He contends that this is unreasonable because there is no evidence the nomifensine affected the health of a horse or conveyed a competitive advantage.

Despite this, the penalty imposed did not constitute an abuse of discretion. While there is indeed no direct evidence that the nomifensine in fact affected the health of the horses or the outcome of a race, "nothing in the Commission's rules requires proof that the drug actually enhanced performance. Rather, the established policy is one of zero-tolerance, where any positive test of a prohibited drug equals prima facie evidence of a violation." *Pierce*, 212 S.W.3d at 754; *see* 16 Tex. Admin. Code §§ 319.3(e), .362(e). The Commission followed its longstanding policy in punishing Kearl without regard to whether the nomifensine in fact affected the health of a horse or the outcome of a race.[9]

---

[8] According to the Guidelines, a first offense is punishable by a one-year license suspension and a fine of $10,000. For a second offense, the penalties increase to a three-year suspension and a $25,000 fine. The penalty for each subsequent offense is a five-year suspension and a $25,000 fine.

[9] Kearl also argues the Commission's action is arbitrary and capricious because Dr. Robinson "has not lost his license for one day." Even assuming the status of Dr. Robinson's license is relevant, the record does not show that the Commission has decided not to punish him.

Kearl also argues that we should consider the "substantial evidence of irregularity" by the Commission or its employees. He contends that a Commission investigator threatened to destroy the reputation of a horse trainer who testified for Kearl, that Commission investigators included false information in their reports, members of the Board made hostile comments during the hearing. Essentially, he asks us to conclude that the Commission's decision was arbitrary because it was based on improper motives rather than the facts of the case. *See Heritage on San Gabriel Homeowners Ass'n*, 393 S.W.3d at 423 ("[W]e must remand for arbitrariness if we conclude that the agency has not genuinely engaged in reasoned decision-making." (citation omitted)). These occurrences, while concerning, do not rise to the level of showing the Commission did not genuinely engage in reasoned decision making.[10]

Concluding that Kearl failed to establish the Commission acted arbitrarily and capriciously, we overrule his sixth issue.

---

Kearl implies that the Commission has no interest in pursuing Dr. Robinson, but Commission investigator Johnny Whitely testified that Dr. Robinson "made himself pretty scarce" and "left pretty quickly after notifications of the positive[ ]" test results. A commissioner asked the executive director whether any action had been taken against Dr. Robinson, and the director replied, "I'd like to cover that with you in private. We're not supposed to discuss an ongoing investigation." Even if a decision to punish Kearl and not Dr. Robinson would be arbitrary and capricious, the record here does not show the Commission made that decision. Moreover, the district court's findings of fact also recite that "Justin Lee Robinson is currently being prosecuted for eight felony counts of illegal influence on racing occurring from May to June 2017, the identical time period relevant to the facts of the instant case."

[10] Kearl also asks us to consider the decision to summarily suspend him at the beginning of this case. Shortly after the positive test results, a board of stewards summarily suspended Kearl's license but failed to hold a hearing within seven days. *See* 16 Tex. Admin. Code § 307.62(i) (authorizing summary suspension and providing, "the licensee is entitled to a hearing on the suspension not later than seven calendar days after the day the license is suspended."). A district court ordered the Board to hold a hearing, which it did. The Board reaffirmed the summary suspension, and the Commission upheld the Board's decision. Kearl argues that the decision to suspend him and the failure to timely hold the hearing was evidence of animus. Kearl litigated the propriety of the Board's actions in his appeal to the Commission, and we will not revisit that issue here.

*Due Process of Law*

Kearl argues in his final issue that the absolute-insurer rule is unconstitutional as applied because it violates his due process rights. *See* 16 Tex. Admin. Code § 311.104(b)(2); *see also Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014) ("[A]n as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances."). The absolute-insurer rule states that a trainer shall, as a condition of licensure, ensure that "a horse or greyhound that runs a race while in the care and custody of the trainer or kennel owner is free from all prohibited drugs, chemicals, or other substances." *Id.* § 311.104(b)(1)–(2).[11] Kearl argues that the Commission violated due process rights by failing to provide him meaningful notice and a hearing. These alleged defects do not stem from application of the absolute-insurer rule to the facts of Kearl's case. In other words, instead of challenging the constitutionality of the absolute-insurer rule, Kearl argues that the Commission's decision is arbitrary and capricious because it denied him the rudiments of due process. *See Oncor Elec. Delivery Co. v. Public Util. Comm'n of Tex.*, 406 S.W.3d 253, 265 (Tex. App.—Austin 2013, no pet.) ("An agency's decision is arbitrary when its final order denies parties due process of law." (citing *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 16 (Tex. 1977))).

The Texas Constitution provides that no person "shall be deprived of life, liberty, [or] property . . . except by the due course of the law of the land." Tex. Const. art. I, § 19. Because of the textual similarities with the due process clause of the Fourteenth Amendment to

---

[11] A similar provision in the Act states that the "licensed trainer of an animal is: (1) considered by law to be the absolute ensurer that no prohibited substance has been administered to the animal; and (2) responsible for ensuring that no prohibited substance is administered to the animal." Tex. Occ. Code § 2034.004.

the United States Constitution, the supreme court has "traditionally followed contemporary federal due process interpretations of procedural due process issues." *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) (quoting *University of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)).

A two-part test governs a due process claim: we must determine first whether the petitioner possesses "a liberty or property interest that is entitled to procedural due process protection" and, if so, "what process is due." *Mosley v. Texas Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019) (citing *Than*, 901 S.W.2d at 929). Kearl argues that he has a protected property interest in his license, and the Commission does not argue otherwise. Assuming without deciding that is correct, we turn to determining whether he received all process due him.

"Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 265 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). We measure what process is due under a "flexible standard" that depends "on the practical requirements of the circumstances." *Id.* "The essence of due process is the requirement that 'a person in jeopardy of serious loss [receive] notice of the case against him and opportunity to meet it.'" *Pierce*, 212 S.W.3d at 758 (quoting *Mathews*, 424 U.S. at 348). Meaningful notice "requires previous notice 'relative to the issues of fact and law which will control the result to be reached by the administrative tribunal.'" *Personal Care Prods.*, 578 S.W.3d at 269 (quoting *Madden v. Texas Bd. of Chiropractic Exam'rs*, 663 S.W.2d 622, 627 (Tex. App.—Austin 1983, writ ref'd n.r.e.)). More specifically, "[a] party is entitled to notice, before the hearing, of the legal norms or standard that will be applied to the facts upon which an agency contemplates taking action." *Oncor Elec. Delivery*, 406 S.W.3d at 269.

Kearl argues that he prepared his case based on the understanding that Commission employees followed the Drug Testing Procedures and did not learn of the Test Barn Instructions until the hearing. But the Commission's compliance with the Drug Testing Procedures or the Test Barn Instructions was not the issue of law that controlled the outcome of the administrative proceeding. As we have explained, Commission rules do not require strict compliance with the Drug Testing Procedures as a prerequisite to valid test results. The controlling legal question is whether the test on the split sample was positive for a prohibited substance and, if so, whether Kearl presented evidence to rebut the prima facie case established by the test result. *See* 16 Tex. Admin. Code §§ 319.3(e), .362(e); *Pierce*, 212 S.W.3d at 754. Furthermore, he does not explain how he would have prepared or presented his case differently had he known of the Test Barn Instructions at an earlier time. *Cf. Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 545 (Tex. App.—Austin 2002, pet. denied) ("Had Ms. Flores known that the Board no longer intended to apply the Dean exception for preexisting conditions caused solely by aging, she might have presented her case differently.").

We conclude Kearl has not shown the Commission violated his due process rights by failing to provide him with meaningful notice. We overrule his final issue.

## CONCLUSION

We affirm the district court's judgment.

_____

                          Edward Smith, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   August 26, 2022