**Affirmed and Opinion filed March 10, 2026.**



In The

# Fifteenth Court of Appeals

---

### NO. 15-24-00050-CV

---

### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND GUADALUPE-BLANCO RIVER AUTHORITY, Appellants

V.

### NATIONAL WILDLIFE FEDERATION, Appellee

---

**On Appeal from the 98th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-20-007096**

---

### OPINION

The Texas Commission on Environmental Quality (TCEQ) and the Guadalupe-Blanco River Authority (GBRA) appeal the district court's judgment, reversing and remanding a TCEQ order that granted a water-rights permit to GBRA (the Order). Although we do not agree with all of the grounds on which the district court relied, we conclude that (1) the Order is affected by error of law because TCEQ erroneously interpreted Section 11.147(e-3) of the Water Code in determining that it was not required to assess the effects of GBRA's proposed

diversions of state water on fish and wildlife habitats, and (2) substantial rights of the appellee, National Wildlife Federation (NWF), have been prejudiced as a result. Consequently, we affirm the district court's final judgment.

## BACKGROUND

Surface water in Texas is owned by the state and held in trust for the public. *See* Tex. Water Code §§ 11.021(a), .0235(a). The right to use state water may be acquired by appropriation for certain purposes as prescribed by Chapter 11 of the Water Code. *See id.* §§ 11.022, .023; *see also id.* § 5.013 (general jurisdiction of TCEQ). The right to appropriate state water is acquired by applying for and obtaining a permit from TCEQ. *See id.* § 11.121 ("[N]o person may appropriate state water or begin construction on any work designed for the storage, taking, or diversion of water without first obtaining permit from [TCEQ] to make the appropriation."). TCEQ may grant the permit only if the application complies with certain procedural and substantive requirements. *See id.* §§ 11.124 (requirements for application to appropriate state water), .134 (action on application). In part, the applicant must demonstrate that the appropriation is sought for a beneficial use. *See id.* §§ 11.023, .134(3)(A).

In 2008, GBRA sought a water-rights permit from TCEQ in connection with a project referred to by the parties as the Mid-Basin Water Supply Project.[1] Specifically, GBRA sought to divert water at one or more points along a 37-mile segment of the Guadalupe River (beginning near the city of Gonzales) for municipal and industrial purposes. In addition, GBRA sought approval of a plan to store some of the diverted water in "off-channel" reservoirs (meaning reservoirs not on the watercourse) for use when adequate flows from the river are not

---

[1] GBRA is a conservation and reclamation district, created by the Legislature in 1935, pursuant to Article XVI, Section 59 of the Texas Constitution.

available. After receiving multiple requests for a contested-case hearing on the application, TCEQ referred the matter to the State Office of Administrative Hearings (SOAH). Some of the requestors, including NWF, were granted affected-party status and participated in the administrative proceedings.

Following the SOAH hearing, the administrative law judges (ALJs) issued a proposal for decision, recommending that TCEQ grant GBRA's application. The ALJs also recommended that (1) TCEQ's Water Availability Division conduct an additional environmental assessment of how construction and operation of the on-watercourse diversion structure would impact fish and wildlife habitats, and (2) TCEQ require GBRA to amend its permit before diverting any water to specify the exact locations of the off-channel reservoirs and the diversion sites.

On September 1, 2020, TCEQ signed the Order, granting GBRA's water-use permit but rejecting the ALJ's recommendations to conduct an additional assessment of fish and wildlife habitats and to require additional location information. The permit contained three authorizations: (1) the right to use and divert 75,000 acre-feet of water per year from the Guadalupe River; (2) the right to store up to 125,000 acre-feet of water in off-channel reservoirs in Gonzales County; and (3) an "exempt inter-basin transfer authorization" to use water from the Guadalupe River in nearby basins.

NWF timely filed a suit for judicial review. *See* Tex. Gov't Code §§ 2001.171, .176(a). After conducting a hearing on the merits, the district court signed a final judgment, reversing the Order and remanding the matter to TCEQ for further proceedings. The district court clarified in a letter to the parties the reasoning for its ruling, stating that (1) TCEQ erred by failing to fully assess the effects on fish and wildlife habitats from GBRA's proposed diversions; (2) TCEQ erred by failing to assess the effects of GBRA's proposed off-channel reservoirs

3

on fish and wildlife habitats; (3) TCEQ's approval of GBRA's water-rights application, which did not identify the location of the diversion points and describe the proposed facilities, was arbitrary and capricious; and (4) the substantial rights of NWF have been prejudiced as a result of TCEQ's improper administrative findings, inferences, conclusions, or decisions. TCEQ and GBRA perfected this appeal, challenging each of the four grounds on which district court relied.

## STANDARD OF REVIEW

Judicial review of an administrative order following a contested-case proceeding is governed by the substantial-evidence rule, which is found in Section 2001.174 of the Texas Administrative Procedure Act (APA). *See* Tex. Gov't Code § 2001.174; *see Mosley v. Texas Health & Human Servs. Comm'n*, 593 S.W.3d 250, 258 (Tex. 2019) (explaining that APA is "generally applicable to all state agencies and processes for judicial review of their decisions"). Under this rule, a court must reverse or remand an agency decision if (1) "substantial rights of the appellant have been prejudiced," and (2) that prejudice is a result of "administrative findings, inferences, conclusions, or decisions" that are

(A)  in violation of a constitutional or statutory provision;

(B)  in excess of the agency's statutory authority;

(C)  made through unlawful procedure;

(D)  affected by other error of law;

(E)  not reasonably supported by substantial evidence considering the reliable probative evidence in the record as a whole; or

(F)  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

4

Tex. Gov't Code § 2001.174.

Under the substantial-evidence rule, the agency's findings, inferences, conclusions, and decisions are presumed to be supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise. *Texas Comm'n on Env't Quality v. Maverick Cnty*, 642 S.W.3d 537, 547 (Tex. 2022); *Upper Trinity Reg'l Water Dist. v. Nat'l Wildlife Fed'n*, 514 S.W.3d 855, 861 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Whether the contestant has met this burden is a question of law, *Dyer v. Texas Comm'n on Env't Quality*, 646 S.W.3d 498, 505 (Tex. 2022), and on review, we focus on the agency's decision without deference to the district court's judgment, *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

To the extent our review requires us to interpret the Water Code and administrative rules promulgated by TCEQ, these issues present questions of law, which we address de novo. *Maverick Cnty.*, 642 S.W.3d at 544 (citing *Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011)). Courts interpret agency rules using the same principles that they apply when construing statutes. *Maverick Cnty.*, 642 S.W.3d at 544. That is, the court's goal is to ascertain and give effect to the drafter's intent, looking first to the plain and common meaning of the text. *Id.* (citing *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). Undefined terms are typically given their ordinary meaning, unless a different or more precise definition is apparent from the term's use in the context of the statute. *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). When an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the regulatory scheme. *Thompson v. Texas Dep't of Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014).

Further, we "generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Texas Citizens for a Safe Future and Clean Water*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).

## DISCUSSION

*Standing*

The substantive issue in this appeal concerns whether the TCEQ's decision to grant the water-rights permit to GBRA is "affected by error of law" and, relatedly, whether substantial evidence supports the TCEQ's conclusion that GBRA's water-rights permit met the requirements for issuance under Chapter 11. As a preliminary matter, however, we consider GBRA's argument that NWF lacks standing to seek judicial review of the TCEQ Order.[2]

Standing is a constitutional prerequisite to filing suit for both individuals and associations, *South Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex. 2017), focusing on whether the party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in the outcome, *Austin Nursing Center, Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). The requirement of standing derives from the separation-of-powers doctrine and, in Texas, the open-courts provision. *Lomas*,

---

[2] GBRA did not bring this challenge to NWF's standing in the proceedings in district court. Because standing implicates subject-matter jurisdiction, it may be raised for the first time on appeal. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018); *State v. Nonparty Patient No.1*, 720 S.W.3d 819, 827 (Tex. App.—15th Dist. 2025, no pet.). To resolve a jurisdictional issue raised for the first time on appeal, we will construe the pleadings in favor of the party asserting jurisdiction and, if necessary, review the record for evidence supporting jurisdiction. *RSL Funding LLC v. Pippins*, 499 S.W.3d 423, 429 (Tex. 2016). To obtain a dismissal without remand, GBRA must show that the existing pleadings and record demonstrate an incurable jurisdictional defect. *Id.*

223 at 307. As to the separation-of-powers doctrine, the requirement of standing ensures that the judiciary does not issue advisory opinions by deciding abstract questions of law without binding the parties. *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001). Consequently, standing requires "a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012).

As a general rule, unless standing is conferred by statute, a plaintiff challenging governmental action must demonstrate that it possesses a particularized interest in the conflict, distinct from that sustained by the public at large. *Lomas*, 223 S.W.3d at 307. In addition, when an association, like NWF, seeks to pursue claims on behalf its members through "associational standing," it must demonstrate that at least one of its members would have standing as an individual had they brought the claims in their individual capacity.[3] *Abbott v. Mexican American Legislative Caucus*, 647 S.W.3d 681, 690 (Tex. 2022); *Lomas*, 223 S.W.3d at 308.

Under Section 2001.171 of the APA, a person is entitled to judicial review of a state agency's decision in a contested case if they are "*aggrieved* by [the] final decision" and they have "exhausted all administrative remedies." Tex. Gov't Code § 2001.171 (emphasis added). Although the APA does not define "aggrieved," the Texas Supreme Court has recognized that the term "relate[s] to the requirement that a person show a 'justiciable interest' in the contested matter." *Hooks v. Texas Dep't of Water Res.*, 611 S.W.2d 417, 419 (Tex. 1981) (noting that judicial-review

---

[3] Specifically, the association must demonstrate that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested required the participation of individual members in the suit. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993). Only the first element of associational standing is at issue in this appeal.

provisions of Water Code "should be read in conjunction and harmony with" the judicial-review provisions of APA); *Texas Rivers Protection Ass'n v. Texas Nat. Res. Conservation Comm'n*, 910 S.W.2d 147, 151 (Tex. App.—Austin 1995, writ denied). In other words, unless the party seeking judicial review is "aggrieved" by the agency's decision—meaning, the party has suffered a concrete and particularized injury—the district court lacks jurisdiction over the suit. *See City of Galveston v. Flagship Hotel, Ltd.*, 319 S.W.3d 948, 952 (Tex. App.—Austin 2010, pet. denied) (concluding that district court lacked jurisdiction over suit for judicial review because party seeking review "[was] not aggrieved by TCEQ's final decision"). Consequently, although NWF's standing in this case is conferred by the APA, the scope of that statutory standing is coextensive with constitutional standing.

In its petition for judicial review, NWF alleged that it is "a membership non-profit corporation with a mission of uniting all Americans to ensure wildlife thrive in a rapidly changing world." NWF further alleged that one of its members owns a fishing and seafood business on the San Antonio Bay, called "Chunky Monkey Seafood." According to NWF's allegations, "because [Chunky Monkey Seafood's] business depends on the quantity and quality of freshwater flows into the San Antonio Bay from the Guadalupe River, the impacts of changes to the water shed and the flow of the Guadalupe River as a result of the issuance of the Permit [by TCEQ] will directly affect [its] legal rights." In other words, NWF alleges that by authorizing GBRA to divert water from the Guadalupe River before it reaches the San Antonio Bay, the TCEQ Order negatively impacts the volume of freshwater flowing into the Bay and, in turn, negatively impacts the economic interests of one of its members.

In addition, at the administrative hearing before SOAH to determine whether

8

NWF and other objectors met the definition of "affected person," as required by the Water Code for party participation in contested-case proceedings, the ALJs heard testimony that the diversion sought by GBRA upstream from the San Antonio Bay would affect conditions, including salinity, in the San Antonio Bay.[4] As to NWF specifically, the owner of Chunky Monkey Seafood and NWF member, Wesley Blevins, testified that he buys and sells a variety of seafood products captured from the Bay, including flounder, shrimp, and oysters, and that when the water levels of the Bay are low, he is unable to capture or purchase seafood in the amounts necessary to sustain his business. Blevins also testified that Chunky Monkey leases property on the Bay, which he uses as a location to purchase seafood from other fishermen, which Chunky Monkey then distributes around the country.

In challenging NWF's standing to bring suit for judicial review, GBRA does not dispute the truth of NWF's economic-impact allegations. Instead, GBRA asserts that for two independent reasons these allegations, even if true, are insufficient to demonstrate that one of NWF's members is "aggrieved" by the TCEQ's Order. First, GBRA contends that the specific issues raised by NWF in its suit for judicial review do not directly concern the freshwater inflows at the San Antonio Bay but instead relate to environmental impacts at the upstream diversion

---

[4] TCEQ may not grant a request for a contested-case hearing "unless [it] determines that the request was filed by an *affected person* as defined by Section 5.115 [of the Water Code]" or if it determines that "the public interest warrants doing so." Tex. Water Code § 5.556(c), (f) (emphasis added). Section 5.115 of the Water Code provides that "affected person" means a person "who has a justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing. *Id.* § 5.115(a). An interest common to members of the general public does not qualify as a personal justiciable interest." *Id.* Although the definition of "affected person" incorporates the justiciable-interest requirement for constitutional standing, affected-person status and standing are discrete issues. *See Texas Comm'n on Env't Quality v. San Antonio Bay Estuarine Waterkeeper*, 714 S.W.3d 270, 282-83 (Tex. App.—15th Dist. 2025, pet. filed) (reviewing denial of affected-person status under substantial-evidence rule).

points and off-channel-storage locations, whereas NWF's alleged economic impact relates only to the conditions at the Bay. Based on the plain language of Section 2001.171, we disagree with GBRA's suggestion that NWF was required to demonstrate for the purpose of standing that its named member is "aggrieved" by the specific errors on which its challenges to the Order are based. Although the issues raised by NWF relate to environmental impacts outside of the Bay, it raises these issues as grounds for obtaining a reversal of TCEQ's final decision to grant GBRA's water-rights Permit. Thus, the relevant jurisdictional inquiry is whether NWF's named member is "aggrieved" by the TCEQ's decision to grant GBRA's request for a permit to appropriate water from the Guadalupe River.

Second, GBRA contends that NWF's allegations are insufficient to support standing because, in its view, Texas law does not recognize standing based on an environmental interest, "absent a directly impacted interest in real property." In support of its argument, GBRA relies on cases from the Third Court of Appeals that, according to GBRA, stand for the proposition that in the absence of a legal right or interest in the property affected, an environmental or recreational impact, by itself, is insufficient to confer standing. *Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 882 (Tex. App.—Austin 2010, pet. denied) (concluding that allegations of injury to environmental, scientific, or recreational interests "without any interest in or connection to the real property involved" were insufficient to demonstrate associational standing because there was "nothing to distinguish [concerns of the association's members] from the same concerns experienced by the public in general"); *Texas Rivers Protection Ass'n*, 910 S.W.2d at 151 (concluding that appellants had standing under Section 2001.171 to challenge permit for diversion because their riparian ownership alone was sufficient to "distinguish[] their injury from that of the public at large"). Applying

this rationale, GBRA contends that because NWF's member does not possess a legal interest in real property along the Guadalupe River, he has not suffered a particularized injury sufficient to confer standing.

The case law on which GBRA relies is neither controlling nor persuasive in this case. NWF's asserted injury is that its member, Blevins, has suffered an economic injury, unlike the environmental and recreational injuries asserted in the cases before our sister court. Further, NWF has alleged and presented evidence that this asserted injury arises from the fact that (1) Blevins relies directly on the Bay for his business, and (2) the Bay, and in turn Blevins' business, will be negatively impacted by the appropriation of water requested by GBRA. Consequently, Blevin's economic injury is sufficiently particularized so as distinguish it from that experienced by the general public. *See Texas Rivers Protection Ass'n*, 910 S.W.2d at 15. Based on the undisputed allegations in NWF's petition concerning the potential economic impact of the proposed diversion on Chunky Monkey Seafood, and the evidence in administrative record before us, we conclude that NWF met its burden to affirmatively demonstrate that it is "aggrieved" by the TCEQ Order that is the subject of its suit for judicial review. *See* Tex. Gov't Code § 2001.171; *In the Interest of H.S.*, 550 S.W.3d 151, 155 (Tex. 2018) (noting that in evaluating standing courts construe the pleadings in the plaintiff's favor and also consider relevant evidence offered by parties).

*Affected by Error of Law*

Next, we consider the parties' arguments concerning whether the TCEQ's conclusion that GBRA's application met all procedural and substantive requirements is supported by substantial evidence. Specifically, in two issues on appeal, TCEQ and GBRA assert that the district court erred in concluding that TCEQ was required to assess the effects of the proposed appropriation on fish and

11

wildlife habitats as a result of both the water diversion and the construction of the off-channel reservoirs. The question we must consider in reviewing these issues is whether TCEQ committed an "error of law" in construing the relevant statutes such that the Order is not supported by substantial evidence. *See* Tex. Gov't Code § 2001.174(2)(D).

"[T]he legislature has expressly required [TCEQ] while balancing all other public interests to consider and, to the extent practicable, provide for the freshwater inflows and instream flows necessary to maintain the viability of the state's streams, rivers, and bay and estuary systems in [TCEQ's] regular granting of permits for the use of state waters." Tex. Water Code § 11.0235(c). Section 11.134 of the Water Code sets forth the requirements that must be met for TCEQ to grant an application for a water-rights permit, which include factors outlined in related provisions. *Id.* § 11.134 ("Action of Application"). In addition, if applicable, the proposed appropriation must consider "the assessments performed under Sections 11.147(d) and (e) [effects of permits on bays and estuaries and instream uses] and Section[] . . . 11.152 [effects of permits on fish and wildlife habitats]." *Id.* § 11.134(b)(3)(D). We will discuss each of these requirements in turn and then attempt to reconcile them in response to the parties' arguments, including TCEQ and GBRA's contention that the assessment under Section 11.152 is not required when an environmental flow standard is already in place. We begin with Sections 11.147 and 11.152.

Under Section 11.147, when considering "an application for a permit to store, take, or divert water, the [TCEQ] shall assess the effects, if any, of the issuance of the permit on the bays and estuaries of Texas" and, in certain areas, "include in the permit any conditions considered necessary to maintain beneficial inflows to any affected bay and estuary system." *See* Tex. Water Code

§ 11.147(b). In making this determination, TCEQ is required to consider certain enumerated factors. *See id.* § 11.147(c)-(e). In part, under subsection (d), the TCEQ must include in the permit, "to the extent practicable when considering all public interests, those conditions considered by the [TCEQ] necessary to maintain existing instream uses and water quality of the stream or river to which the application applies." *Id.* § 11.147(d). Under subsection (e), the TCEQ must include in the permit, "to the extent practicable when considering all public interests, those conditions considered by the [TCEQ] necessary to maintain fish and wildlife habitats." *Id.* § 11.147(e). Of import here, in determining what conditions to include in the permit under subsection (e), "the [TCEQ] shall consider any assessment performed under Section 11.152." *Id.* § 11.147(e). Separately, Section 11.152 states:

> In its consideration of an application for a permit to store, take, or divert water in excess of 5,000 acre feet per year, the [TCEQ] shall assess the effects, if any, on the issuance of the permit on fish and wildlife habitats and may require the applicant to take reasonable actions to mitigate adverse impacts on such habitat.

*Id.* § 11.152.

In 2007, as part of Senate Bill 3, the Legislature amended the Water Code to create a basin-by-basin process for developing recommendations to meet instream needs as well as freshwater inflows to affected bays and estuaries. *See id.* § 11.1471. Under Section 11.1471, titled "Environmental Flow Standards and Set-Asides," the TCEQ is required to adopt by rule "environmental flow standards for each river basin and bay system in this state that are adequate to support a sound ecological environment, to the maximum extent reasonable considering other

13

public interests and other relevant factors."[5] *See id.* In addition, under Section 11.134, any proposed appropriation of state water must now consider "any applicable environmental flow standards established under Section 11.14741." *Id.* § 11.134(b)(3)(D). Against the backdrop of this statutory scheme, we now turn to the parties' interpretation of these provisions and how they apply to the requested permit.

Throughout the underlying administrative proceedings, and now in this appeal, the parties have disagreed as to whether TCEQ was required under Section 11.152 to conduct a site-specific analysis of the effects of GBRA's proposed diversions on fish and wildlife habitats. Specifically, NWF asserts that TCEQ's Order is not supported by substantial evidence because TCEQ failed to assess the effects of the proposed diversion on fish and wildlife habitats and that this assessment is required by Section 11.134 and Section 11.147(e). Conversely, TCEQ and GBRA argue that when environmental flow standards are adopted for a particular basin (as they have been for the Guadalupe River Basin), it should consider and apply those standards *instead of* conducting a site-specific environmental analysis.[6] *See* 30 Tex. Admin. Code § 298.360 (Tex. Comm'n on Env't Quality, Findings). In its adopted findings of fact and conclusions of law, the TCEQ found that the proposed permit "properly applies and implements the TCEQ's instream flow standards for the Guadalupe River" and "properly applies and implements the TCEQ's freshwater inflow standards for the San Antonio Bay." Thus, in the view of TCEQ and GBRA, TCEQ was not required to conduct

---

[5] The Water Code defines "environmental flow standards" as "those requirements adopted by [TCEQ] under Section 11.1471." Tex. Water Code § 11.002(17). "Environmental flow analysis" means the application of a scientifically derived process for predicting the response of an ecosystem to changes in instream flows or freshwater inflows. *Id.* § 11.002(15).

[6] The environmental flow standards for the Guadalupe River Basin are found in Chapter 298, Subchapter E, of Title 30 of the Texas Administrative Code.

14

a separate assessment of the site-specific impact of the proposed diversions from the Guadalupe River on fish and wildlife habitats because it applied the basin's environmental flow standard instead.

In support of its argument, the TCEQ and GBRA rely on Section 11.147, subsection (e-3), which was added as part of Senate Bill 3. This provision states:

> Notwithstanding Subsection (b)-(e), *for the purpose of determining the environmental flow conditions necessary to maintain* freshwater inflows to an affected bay and estuary system, existing instream uses and water quality of a stream or river, or *fish and aquatic wildlife habitats*, the [TCEQ] shall apply any applicable environmental flow standard . . . adopted under Section 11.1471 *instead of* considering the factors specified by those subsections.

*Id.* § 11.147(e-3) (emphasis added). Focusing on the "instead of" language, TCEQ and GBRA assert that when an environmental flow standard is adopted, subsection (e) and, by cross-reference, Section 11.152 do not apply and that, consequently, a site-specific assessment of effects fish and wildlife habitats is not required. In other words, in TCEQ's view, site-specific assessments "have been programatically replaced by the adoption of environmental flow standards for the [Guadalupe River Basin]." In contrast, NWF focuses on the phrase "for the purpose of determining the environmental flow conditions necessary to maintain . . . fish and aquatic wildlife habitats." According to NWF, under this language, the adoption of an environmental flow standard displaces Section 11.152 only to the extent the standard bears on the environmental flow conditions necessary to maintain fish and aquatic wildlife habitats.

We conclude that, under the plain language of Section 11.147, subsection (e-3), the application of an adopted environmental flow standard relieves the TCEQ

from its duty to perform an assessment under Section 11.152 but only "for the purpose of determining environmental flow conditions necessary to maintain" certain conditions, including "fish and aquatic wildlife habitats." This interpretation is consistent with Section 11.134, which suggests that Section 11.152 may be applicable even when an environmental flow standard has been adopted. *See id.* § 11.134(b)(3)(D) (stating that proposed appropriation must "consider[] any applicable environmental flow standards established under 11.1471 *and, if applicable,* the assessment[] performed under Section[] . . . 11.152" (emphasis added)).

In addition, contrary to the broad interpretation urged by TCEQ and GBRA, this interpretation does not render a portion of the language in subsection (e-3) meaningless. When interpreting a statute, we read the statute contextually to give effect to every word, clause, and sentence. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). "As a general principle, we eschew constructions of a statute that render any statutory language meaningless or superfluous." *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 57 (Tex. 2015). Under the broad interpretation urged by TCEQ and GBRA, everything in subsection (e-3) after "Notwithstanding Subsection (b)-(e)" and before "the [TCEQ] shall apply" is unnecessary and superfluous. Under their construction, if an environmental flow standard exists for a basin, as it does here, then the factors in subsections (b)-(e) do not apply. They ignore the language in between the two clauses, which we cannot do.

Moreover, we presume that the legislature deliberately chose to use the phrase "fish and *aquatic* wildlife habitats" in subsection (e-3), as opposed to the phrase "fish and wildlife habitats," as is used in Section 11.152, and that these phrases have different meanings. *See Texas Mut. Ins. Co. v. Ruttier*, 381 S.W.3d

16

430, 452 (Tex. 2012) (explaining that court "presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact"). Consequently, if GBRA's proposed diversion would impact "fish and aquatic wildlife habitats" for reasons unrelated to environmental flow or would impact non-aquatic "wildlife habitats," TCEQ must conduct an assessment under Section 11.152. To the extent TCEQ has construed Section 11.147(e-3) to mean that it is *never* required to conduct a site-specific assessment under Section 11.152 when an environmental flow standard has been adopted for the river basin at issue, TCEQ committed an error of law, as the district court correctly concluded.[7]

In a separate but related issue, TCEQ and GBRA argue that even if an assessment of fish and wildlife habitats may be required as a result of the diversion facilities on the Guadalupe River, an assessment is not required as to the storage reservoirs because the reservoirs and its impacts, if any, are located entirely off the watercourse. TCEQ and GBRA point out that Chapter 11 does not require nor authorize TCEQ to dictate specifics as to how water will be stored after its diversion from the watercourse, except as it relates to the viability of the appropriation's intended beneficial use. Conversely, NWF contends that the Water Code requires TCEQ to assess the environmental impacts of both the proposed diversion and the off-channel reservoirs and that TCEQ violated its statutory authority by granting GBRA's water-use permit without doing so.

---

[7] In Conclusion of Law 28A, the TCEQ states:

> The Legislature has effectively made the majority of the Texas Water Code [Section] 11.152 review a part of the broader fish and wildlife instream uses review in Texas Water Code [Section] 11.147(e), and Texas Water Code [Section] 11.147(e-3) substitutes these broader fish and wildlife reviews during the permit process with the environmental flows rulemaking for those protections once the [TCEQ] adopts those rules for a river basin.

17

As previously discussed, Chapter 11 provides a mechanism whereby a party may acquire by appropriation the right to use water belonging to the state. *See* Tex. Water Code §§ 11.021.-.0235. And, at least in some circumstances, the TCEQ must assess the effects of the "issuance of a permit" on fish and wildlife habitats. *Id.* § 11.152. Similarly, Rule 297.53 states that the TCEQ must assess the effects, if any, "of the granting of the application on fish and wildlife habitat." 30 Tex. Admin. Code § 297.53 (Tex. Comm'n on Env't Quality, Habitat Mitigation). This assessment "must include the project site as well as potentially impacted habitat upstream, adjoining, and downstream of the project site." *Id.* § 297.53(c).

Based on the plain language of the statute, and consistent with Rule 297.53, we agree that an assessment of the effects of an application for water rights on fish and wildlife habitats is limited to the site of the proposed appropriation (whether by storing, taking, or diverting from the watercourse), as well as any potentially impacted habitats "upstream, adjoining, and downstream" from the site of appropriation. Here, there is no dispute that GBRA sought and TCEQ granted permission for GBRA to divert 75,000 acre feet per year from the Guadalupe River and to then store some of the diverted water in "off-channel reservoirs." While the initial diversion of the water from the watercourse could trigger an assessment under Section 11.152, the subsequent storage of diverted water in reservoirs is not, itself, an appropriation, and there is no evidence that the reservoirs are located at the appropriation site or in an area "upstream, adjoining, [or] downstream" from the site. Consequently, the TCEQ did not commit an error of law in concluding that it was not required to assess of the effects of the off-channel reservoirs on fish and wildlife habitats.

*Substantial Rights*

Next, we consider the TCEQ and GBRA's argument that the district court erred in concluding that NWF's "substantial rights . . . have been prejudiced" by the TCEQ findings and conclusions that are the basis of its complaints, as required for reversal by Section 2001.174 of the APA. In *Dyer v. Texas Commission on Environmental Quality*, the Texas Supreme Court explained that it is not enough for an agency's findings and conclusions to be "faulty as a matter of law," but "they must also prejudice the substantial rights" of the party challenging them. 646 S.W.3d at 514. But "prejudic[ing] the substantial rights" of a party does not mean that a party must show individualized harm, such as in an analysis of whether a party has standing. Rather, the substantial-rights prong effectively requires the reviewing court to conduct a harm analysis. *AEP Tex. Com. & Indus. Retail, Ltd. P'ship v. Pub. Util. Comm'n of Tex.*, 436 S.W.3d 890, 914 (Tex. App.—Austin 2014, no pet.); *see* Tex. R. App. P 44.1(a) (standard for reversible error). Findings that are improper do not require reversal if they are unnecessary, so long as the agency's necessary findings are supported by substantial evidence. *Dyer*, 646 S.W.3d at 514. "An improper, but superfluous, finding does not prejudice the substantial rights of the appellant." *Id.*

In this case, we have determined that TCEQ erred in interpreting Section 11.147, subsection (e-3). Specifically, TCEQ erred in concluding that under Section 11.147, when an environmental flow standard is adopted for a basin, a permit for water rights from that basin may be granted without having to assess the effects of the proposed diversion on fish and wildlife habitats, as is otherwise required by Section 11.152. Thus, the relevant inquiry as it relates to the substantial-rights prong is whether this error of law caused TCEQ to improperly grant GBRA's permit or, instead, whether other conclusions and findings

19

supported by substantial evidence support TCEQ's determination that a fish-and-wildlife-habitat assessment was not required in this case, despite its erroneous interpretation of subsection (e-3).

Neither TCEQ nor GBRA explain, and we fail to see, how the TCEQ's findings of fact and conclusions of law otherwise support a determination that a fish-and-wildlife assessment was not required in this case. That is, there are no findings or conclusions establishing that any impact of the proposed diversions on fish and aquatic wildlife habitats relates solely to environmental flow conditions and that the proposed diversions would not impact non-aquatic wildlife habitats. Instead, the record shows that the TCEQ's decision to grant GBRA's requested water-rights permit without first assessing the effects of the permit on fish and wildlife habitats at the proposed diversion points was a result of TCEQ's erroneous interpretation of Section 11.147, subsection (e-3). Thus, TCEQ's error of law prejudiced NWF's substantial rights. *See* Tex. Gov't Code § 2001.174.

Applying Section 2001.174 of the APA, we affirm the district court's decision to reverse the TCEQ Order and to remand the cause to TCEQ for further proceedings. In those proceedings, the TCEQ should reconsider, in light of our decision, whether site specific assessments of the proposed diversion's effects on fish and wildlife habitats are required in this case and make any necessary findings of fact and conclusions of law to support its decision.

*Alleged Application Defects*

Finally, we consider TCEQ and GBRA's argument that the district court erred in concluding that "TCEQ's approval of a water rights application that did not identify the location and described the proposed facilities was arbitrary and

capricious."[8] *Id.* § 2001.174(2)(F); *see Charter Med.-Dallas*, 665 S.W.2d at 454 ("In enacting the [Texas Administrative Procedure and Register Act], it is clear that the legislature intended to distinguish between agency action that is not supported by substantial evidence and agency action that is arbitrary and capricious."). Section 11.124 of the Water Code specifies that an application for a water-rights permit must include certain information. Tex. Water Code § 11.24. Relevant here, the application "state the location and describe the proposed facilities," and be "accompanied by map or plat." *Id.* §§ 11.24(a)(5), .125. Similarly, TCEQ Rule 295.7 states that "the application shall state the location of point(s) of diversion and, if applicable, the location of dam(s) or off-channel storage reservoirs." 30 Tex. Admin. Code § 295.7 (Tex. Comm'n on Env't Quality, Location of Diversion Point, Reservoir, and Dam).

Here, there is no dispute that GBRA did not identify specific diversion points in its application. GBRA instead identified a 37-mile stretch of the Guadalupe River from which it would divert at one or more points (referred to by the parties as a "diversion reach"), and submitted maps depicting the proposed diversion segment. TCEQ argues that the location and description of the proposed facilities provided by GBRA was sufficient to allow the TCEQ to conduct a "full legal and technical analysis" and that the applicable statutes and rules do not require "exact precision in identifying the location of the facilities."

Although the term "location" is not defined in the Water Code, we agree that the term "location" in Section 11.124, when considered in the context of Chapter

_____

[8] An agency's decision is arbitrary if it (1) fails to consider a factor that the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *Public Util. Comm'n v. Texas Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021).

21

11 of the Water Code, as a whole, means information regarding the location of the diversion sufficient to allow TCEQ to analyze the impact of the proposed appropriation, including on bays and estuaries. *See Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 628 (noting that courts "generally avoid construing individual provisions of statue in isolation from the statute as a whole"). Nevertheless, we need not decide whether TCEQ's decision to accept GBRA's 37-mile diversion reach without requiring additional location information was arbitrary and capricious. We have concluded that, based on an incorrect statutory interpretation, TCEQ did not properly consider whether fish-and-wildlife-habitat assessments should be conducted at the proposed diversion sites. In addition, we have concluded that the case should be remanded to the TCEQ for it to reconsider that issue under the statute as correctly interpreted by this Court. If TCEQ concludes that site-specific assessments are necessary in this case, it should also consider whether additional information regarding the proposed diversion locations is necessary for the purpose of conducting those assessments.

## CONCLUSION

We affirm the district court's judgment on the ground that TCEQ committed an error of law by concluding it was not required to analyze the effects of GBRA's proposed diversions on fish and wildlife habitats before granting GBRA's water-rights permit and that the substantial rights of NWF have been prejudiced as a result. *See* Tex. Gov't Code § 2001.174. On remand, TCEQ should determine whether an assessment of the effects on fish and wildlife habitats is required under the facts presented in this case and, if so, whether the additional information regarding the location of the proposed diversion sites is necessary for conducting that assessment.

/s/Scott K. Field

Scott K. Field
Justice

Panel consists of Chief Justice Brister and Justices Field and Farris